**EXHIBIT A**

Filing # 208984704 E-Filed 10/17/2024 11:15:41 AM

IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR CHARLOTTE COUNTY, FLORIDA

CLAUDIO ALEJANDRO BEVILACQUA, an individual;
Plaintiff,
vs.

CASE No. 24-001917CA

FRONTLINE CONSTRUCTION PARTNERS, LLC, a dissolved Georgia company; MODERN BUILDERS, INC. An active Florida corporation, FRONTLINE CAPITAL PARTNERS, INC., an active Georgia corporation, IFP FUND I, LLC, an Active Delaware company, GREGG GLASSER, an individual, ALICIA JENKS, an individual and J. DONALD BOGGUS, JR., an individual.
_____________________________________/

**SUMMONS: SERVICE ON A CORPORATION**

THE STATE OF FLORIDA:

To Each Sheriff of Said State:

YOU ARE COMMANDED to serve this summons and complaint in this action upon the below named Defendant:

**IFP FUND I, LLC**
**c/o BRYAN ZIEGENFUSE**
**448 N. 10th STREET**
**SUITE 402**
**PHILADELPHIA, PA 19123**

**IMPORTANT:**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint in this Court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your case. If you do not file your written response on time, you may lose the case, and your wages, money, and property may be taken

thereafter without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). If you choose to file a written response yourself, at the same time you file your written response to the Court, you must also mail or take a copy of your written response to Plaintiff's attorney:

Claudio R. Cedrez Pellegrino, Esq.
Law Offices of Claudio R. Cedrez, LLC
ONE BISCAYNE PLACE
11098 Biscayne Boulevard, Suite 100-A
Miami, FL 33161
Tel. 305/763-8678
Email: eservice@cedrezlaw.com

Dated on 10/18/2024, 2024

Clerk of Circuit Court

By: ______________________

Deputy Clerk

IN CHARLOTTE COUNTY If you are a person with a disability who needs any accommodation in order to participate in this proceedings, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Jon Embury, Administrative Services Manager, whose office is located at 350 East Marion Avenue, Punta Gorda, Florida 33950, and whose telephone number is 941-637-2110, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, usted puede consultar a un abogado inmediatamente. Si no conoce a

un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presente su respuesta ante el tribunal, usted debe enviar por correo o entregar una copia de su respuesta a la persona denominada abajo. Si usted elige presentar personalmente una respuesta por escrito, en el mismo momento que usted presente su respuesta por escrito al Tribunal, usted debe enviar por correo o llevar una copia de su respuesta por escrito a la parte entregando esta orden de comparencencia a:

Claudio R. Cedrez Pellegrino, Esq.
Law Offices of Claudio R. Cedrez, LLC
ONE BISCAYNE PLACE
11098 Biscayne Boulevard, Suite 100-A
Miami, FL 33161
Tel. 305/763-8678
Email: eservice@cedrezlaw.com

**IMPORTANT**

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le delai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite a la partie qui vous depose cette citation. Nom et adresse de la partie qui depose cette citation:

Claudio R. Cedrez Pellegrino, Esq.
Law Offices of Claudio R. Cedrez, LLC
ONE BISCAYNE PLACE
11098 Biscayne Boulevard, Suite 100-A
Miami, FL 33161
Tel. 305/763-8678
Email: eservice@cedrezlaw.com

**IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR CHARLOTTE COUNTY, FLORIDA**

**CLAUDIO ALEJANDRO BEVILACQUA, an individual;**
**Plaintiff,**
**vs.**

**CASE No. 24-001917CA**

**FRONTLINE CONSTRUCTION PARTNERS, LLC, a dissolved Georgia company; MODERN BUILDERS, INC. An active Florida corporation, FRONTLINE CAPITAL PARTNERS, INC., an active Georgia corporation, IFP FUND I, LLC, an Active Delaware company, GREGG GLASSER, an individual, ALICIA JENKS, an individual and J. DONALD BOGGUS, JR., an individual.**

## FIRST AMENDED COMPLAINT

Comes now the Plaintiff Claudio Alejandro Bevilacqua, by and through the undersigned counsel and hereby files this Complaint against defendants: **FRONTLINE CONSTRUCTION PARTNERS, LLC, MODERN BUILDERS, INC., FRONTLINE CAPITAL PARTNERS, INC., IFP FUND I, LLC, GREGG GLASSER, ALICIA JENKS, and J. DONALD BOGGUS, JR.,** and in support thereof states and alleges;

### Jurisdiction and venue

1. This cause is an action for damages exceeding the $50,000 jurisdiction limit without including costs interest in attorney fees.
2. The facts supporting this causes of action arose and took place in Charlotte County, Florida.
3. Defendant Modern Builders, Inc. (hereinafter, "Modern") is a Florida corporation which operates in various counties including Charlotte County.
4. Defendant Frontline Construction Partners, LLC, (hereinafter, "Construction

Partners"), is a dissolved Georgia limited liability company authorized to transact business in Florida.

5. Defendant Frontline Capital Partners, INC., (hereinafter, "Capital Partners"), is an active Georgia corporation authorized to transact business in Florida.

6. Defendant IFP Fund I, LLC, (hereinafter, "IFP"), is an active Delaware limited liability company which has engaged in business in Charlotte County, Florida.

7. Gregg Glasser, (hereinafter "Glasser"), is a resident of Sarasota County, Florida, a Florida licensed general contractor who has engaged in business in Charlotte County, Florida, over the age of 18 and otherwise sui juris.

8. Defendant, Alicia Jenks (hereinafter "Jenks") is a resident of Hillsborough County, Florida, a licensed Real Estate Sales associate, who has engaged in business in Charlotte County, Florida, over the age of 18 and otherwise sui juris. Upon information and belief, Ms. Jenks is an employee of Capital Partners, of Modern and the daughter of Mr. Glasser.

9. Defendant, J. Donald Boggus, Jr., (hereinafter "Boggus") is a resident of Jasper County, Georgia, who has engaged in business in Charlotte County, Florida, over the age of 18 and otherwise sui juris.

10. Plaintiff Claudio Alejandro Bevilacqua (hereinafter Bevilacqua) is a resident of the Country of Argentina, over the age of 18 and otherwise sui juris.

11. All Defendants are subject to this Court's jurisdiction because they operate, conduct, engage in, or carry on a business venture in this state; committed several tortious acts within the state; contracted for and engaged in real estate construction

services in this state and received payment from Plaintiffs in this state.

12. Each claim and cause of action which is the subject of this Complaint arises out of transactions in the state of Florida between Plaintiffs and Defendants. Even further, the claims and causes of action arise from a construction project located in the State of Florida.

13. Venue is proper in Charlotte County, Florida, pursuant to Fla. Stat§ 47.011, because the cause of action arose and occurred in this judicial district, the Plaintiffs suffered damages from Defendants' acts and conduct in this judicial district, and the subject contract requires that all claims and controversies be brought in this judicial district. Finally, the real property in question is located in Charlotte County, Florida.

## RELATIONSHIPS BETWEEN DEFENDANTS

14. Construction Partners and Capital Partners are both Georgia entities, controlled by Defendant Boggus. Boggus is the Managing Partner of Capital Partners and was the Sole Member of Construction Partners. Construction Partners engaged in the construction industry in Florida as well as the financing of construction projects. Capital Partners engaged in the financing aspect of different construction projects. Both entities participated together in projects without a clearly defined boundary. Capital Partners is not a lender licensed in Florida and did not act through a mortgage broker.

15. Jenks is an employee or representative of Capital Partners, and the daughter of

Glasser. Jenks is also a real estate professional, looking to benefit from the real estate transactions.

16. Glasser is general contractor in the state of Florida and the qualifier for the Construction Partners.

17. Jenks and Glasser work together in the marketing, development and promotion of real estate investments in Florida particularly targeting foreigners who own vacant lots.

18. Modern is a company owned and managed by Glasser, which fraudulently took ownership of Plaintiff's real estate and mortgaged it for substantially all its value.

19. IFP is a lender who working in close relationship with Glasser, Modern, Capital Partners and Construction partners, has agreed to finance in bulk all the properties fraudulently acquired by Construction Partners and Modern through Quit-Claim Deeds from owner who wished to develop their lots.

20. Most of the victims of the real estate alienation and mortgaging were foreigners from Argentina, Chile and Ecuador, who trusted Defendants.

21. The scheme of Quit-Claim Deed and further Mortgaging took place mostly in Sarasota and Charlotte County, Florida and IFP had to be aware of the illegal operation.

22. Claudio Alejandro Bevilacqua is an Argentine citizen who fell prey to the marketing and false promises of Defendants.

**COMMON ALLEGATIONS**

23. On or about August 9, 2017, Plaintiff Bevilacqua purchased two vacant lots in Charlotte County Florida, to wit:

Lot 24, Block 23, ROTONDA SANDS NORTH REPLAT, UNIT 1, a subdivision according to the Plat thereof, recorded in Plat Book 11, Pages 4A through 4Z2, of the Public Records of Charlotte County, Florida.

Lot 25, Block 23, ROTONDA SANDS NORTH REPLAT, UNIT 1, a subdivision according to the Plat thereof, recorded in Plat Book 11, Pages 4A through 4Z2, of the Public Records of Charlotte County, Florida.

24. During the year 2021, Plaintiff Bevilacqua and his representatives came into contact with Glasser and Jenks, who were acting on behalf of Construction Partners and Capital Partners.

25. Glasser represented to Plaintiff that he as a general contractor and his companies has extensive experience in constructing residential homes in vacant lots.

26. After general discussions about the size and specifications of the homes to be built, Glasser and Jenks impressed on Bevilacqua the urgency of starting the project soon, as the Covid-19 pandemic was ending and the market was going to improve soon.

27. By the end of October, Jenks and Glasser prepared two almost identical contracts detailing the construction of the two homes (Exhibits "A" and "B").

28. The contracts required Bevilacqua to pay $51,151.50 as an initial deposit. Paragraph 3 of this October 29, 2021 contract had two options to be selected indicating whether the owner required construction loan financing. If the owner did not require financing, then the $51,151.50 deposit for each home ($102,303.00), were non-refundable.

29. The contracts were finalized on November 18, 2021 and Bevilacqua made payment as required. Boggus, Jenks and Bevilacqua signed the contracts.

30. After having made sure that Bevilacqua could not get his deposit back, During December 2021, Defendants Jenks and Glasser, with full knowledge of Boggus, prepared an addendum designed to confuse and divest Plaintiff of his property (included in Exhibit "A" and "B").

31. The addendum, prepared sometime after November 18, 2021, purportedly did away with the financing clause contained in paragraph 8 of the original contract, and instead proposed contractor financing, at 9.5% interest rate, with 2.25% origination points and 6 months of prepaid interest.

32. More outrageously, the amendment later adds language requiring a deed transfer, which in fact contradicts the contractor financing proposed.

33. Defendants presented all the paperwork in English to Plaintiff Bevilacqua, who signed it remotely from South America.

34. Neither Defendant made any effort to explain to Plaintiff the meaning or extent of the agreements.

35. Months went by without any news, until June, 2022, when Glasser prepared a Quit-Claim Deed for each of the properties, and sent them via email to be signed, without explaining what it was and only explaining that it was necessary paperwork to move the construction along (Exhibits "C" and "D").

36. Mr. Bevilacqua received the documents and signed them on June 23, 2022. The executions of the Quit-Claim Deeds were in violation of Fla. Stat. 695.03 and Fla. Stat. 117.107. In fact, the Quit-Claim Deeds did not comply with the necessary elements to be recorded, as it was not an original and was not acknowledged before a Public Notary. In fact, upon information and belief, Jenks or Glasser, who took

the Deeds for recording, blurred the seal of the signed, to avoid the scrutiny of the County Recorder's Office.

37. After a few months, Construction Partners who was the grantee on both Deeds, further aggravated the fraud by transferring both real estate properties obtained from Plaintiff to Modern, also via Quit-Claim Deed (Exhibits "E" and "F"). Plaintiff was never informed of these transfers.

38. Defendants Glasser, Jenks and Boggus entered into a blanket or bulk arrangement for mortgage financing with Defendant IFP. As a general practice, in dozens of scenarios, Defendants obtained Quit-Claim Deeds for vacant lots from their owners, and took mortgages from IFP, for all or most of the value of the real estate.

39. Defendant Capital Partners was engaged in the business, but not as a lender, but instead a facilitator and beneficiary.

40. Each of the Mortgages was taken for $322,000.00, even though the alleged balance for each contract was $289,858.50. Without advancing the work, Defendants were paid in advance $373,151.50 for each property.

41. But this is not all, Defendants kept all the proceeds of the loans, kept title of the property and are forcing Plaintiff to pay the initial charges of the loan and the monthly interests, adding several thousand dollars of damages to the fraudulent maneuver.

42. In addition to the above, the Defendants have delayed the completion of the home and are years behind schedule while forcing Plaintiff to pay interest on funds he never received.

43. Fla. Stat. § 489.1195(l)(a) provides that all primary qualifying agents for a business

organization are jointly and equally responsible for supervision of all operations of the business organization; for all field work at all sites; and for financial matters, both for the organization in general and for each specific job.

44. As such, the Defendant, GLASSER, as the primary qualifying agents for the general contractor, MODERN, entered into a contract with the Plaintiffs for the construction and/or improvement(s) of the Plaintiff's real property.

45. Any and all conditions precedent to this action have been performed, satisfied, or waived.

46. The Plaintiffs have retained the undersigned law film to represent them in this matter and has agreed to pay a reasonable attorneys' fee for its professional services.

<u>COUNT I</u>

<u>(against Modern, Capital Partners, Construction Partners, Jenks, Glasser, Boggus and IFP)</u>

**<u>VIOLATION OF THE TRUTH IN LENDING ACT (TILA)</u>**

47. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

48. The Defendant(s) and/or its agent(s) violated the Trust in Lending Act, 1501 U.S.C. §§ 1601 *et seq.*, and Regulation Z, by failing to provide accurate and adequate disclosures to Plaintiff regarding to or associated with the closing for the various loans and by charging fees and costs not allowed or face in excess of those allowed under the statute, to wit:

   a. Failing to deliver two copies of notice of the right to rescind with all the

pertinent statutory disclosures;

b. Failing to properly and accurately disclose the amount financed;

c. Failing to properly and accurately disclose the annual percentage rate;

d. Failing to clearly and adequately disclose the number, amounts, and timing of payments scheduled to repay the obligation;

e. Failing to clearly and adequately itemize the amount(s) financed.

f. Failing to provide the charging fee(s) that were not bona fide and reasonable in amount including title, document preparation, credit report, appraisal, and escrow closing fees.

49. The Defendant(s) and/or their agent(s) failed to disclose to the Plaintiff the proper amount(s) financed, in violation of12 C.F.R. § 226.18(b). The Defendant(s) failed to provide the Plaintiff Trust in Lending Disclosure Statement ("TILDS") reflecting the financed amount(s) for each of the Properties.

50. The Defendant(s) and/or their agent(s) also failed to disclose to the Plaintiff the correct annual percentage rate ("APR"), in violation of 12 C.F.R. § 226.22(a)(2), (4).

51. The Defendant(s)' TILA violations are apparent on their face since none of the requisite aforementioned disclosures were provided to the Plaintiff.

52. The Defendant(s) have been unjustly enriched at the expense of the Plaintiff, who are therefore entitled to equitable restitution, disgorgement, and rescission for failure to make clear, conspicuous, and accurate material disclosures.

53. The loan closing(s) executed by the Defendant(s) were conducted in such a way as

to purposefully prevent and withhold full disclosure of the actual loan te1ms to the Plaintiff.

54. Complete copies of the loan document(s) for the Properties were not delivered to the Plaintiff by the Defendant(s) and the Plaintiff consequently was not able to understand any and all of the te1m(s) of the loan(s) obtained by the Defendant(s) for the Plaintiff's Properties.

55. The act(s) of the Defendant(s), as described herein, were willful, wanton, and conscious disregard of the Plaintiff's rights.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and prays that the Court award Plaintiff actual damages, compensatory damages, incidental damages, statutory damages, disgorgement of profits, restitution, and attorneys' fees and costs if awardable by law, and such other relief which this Court deems just, necessary, and proper.

## COUNT II

## FRAUDULENT INDUCEMENT

(against Capital Partners, Construction Partners, Jenks, Glasser and Boggus)

56. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

57. During the negotiation stageof the agreement for the Construction of the homes, the Defendants misrepresented to the Plaintiff several facts. First, they offered a contract without financing, to make sure the deposit was non-refundable, later, they sneakily included an addendum which appeared to offer construction financing by the construction company, but in reality switched the business documenting a transfer of the properties.

58. Additionally, Defendants became the new owners of the properties without paying

for them, took mortgages on both properties, appropriating the proceeds and forced Plaintiff to pay the costs of the loan and the monthly interests, while they delayed the completion.

59. Additionally, between the deposits for the contracts and the mortgage proceeds, the Defendants received more funds than they would have under the contract.

60. Defendants indicated at a distance that the that paperwork to be executed was to assist with financing.

61. The entire misrepresentation was aided by the fact that Plaintiff was in a different continent and did not have a good command of the English language.

62. Defendants boosted their experience and the number of years they had been involved in construction and financing, making the transaction seem as a typical one.

63. The misrepresentations made by the Defendant(s) to the Plaintiff were material misrepresentations. The Plaintiff would not have entered into the Construction Contract(s) but for the aforementioned false representations.

64. That the Defendant(s) knew or should have known that those representations were false and inaccurate.

65. That the Defendant(s) intended that the material misrepresentations detailed above, were made to the Plaintiffs and in order to cause the Plaintiffs to rely upon those material misrepresentations.

66. That the Plaintiff did in fact reasonably and justifiably rely upon the material misrepresentations of the Defendant(s) causing the Plaintiff to enter into the Construction Contract(s) and Addenda for the Properties.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and prays that the Court award Plaintiffs actual damages, compensatory damages, incidental damages, statutory damages, restitution, and attorneys' fees and costs if awardable by law, and such other and further relief which this court deems just, necessary, and proper.

## COUNT III

## FRAUDULENT MISREPRESENTATION

(against Capital Partners, Construction Partners, Jenks, Glasser and Boggus)

67. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

68. That the Defendant(s) asked the Plaintiffs to sign the contract, without explaining that financing would be necessary and making sure Plaintiff would lose the ability to request a refund of more than $103,000.00.

69. Then Defendant misrepresented to Plaintiff that the documents sent via *docusign* were the necessary documents to move forward with financing of the project, without explaining the change in terms, the change of ownership of the property or the amount of financing.

70. The Defendant(s) knowingly made false representations to the Plaintiffs in order to secure the transfer and subsequent possession of the Plaintiffs' Properties.

71. The Defendant(s) induced the Plaintiffs to sign the documents which would result in the transfer of the titles to Defendant(s) for the purported sole purpose of getting financing, without disclosing the transfer of the properties.

72. That the Defendant(s) had no intention of returning the Properties to the Plaintiff and allow the Plaintiffs but instead thy sought to get the initial deposit plus the entire proceeds of the mortgage loan.

73. That Defendants misrepresented to Plaintiff that Plaintiff had to pay the advance costs of the loan and the monthly payment of such loan without disclosing that it was not Plaintiff's loans nor Plaintiffs' real estate. That the fraudulent misrepresentation(s)

induced Plaintiffs to act in reliance on same, and (I) execute the Construction Contract(s) and Addenda and pay the advance costs and the monthly costs of the loans.

74. That as a result of the fraudulent action(s) and conduct by the Defendant(s), the Plaintiff has retained the undersigned to represent them in this matter and has obligated himself for the payment of fees and court costs, which fees and costs the Defendant(s) should be required to pay.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and prays that The Court award Plaintiff actual damages, compensatory damages, incidental damages, statutory damages, restitution, and attorneys' fees and costs if awardable by law, and such other relief which this court deems just, necessary, and proper.

**COUNT IV**

(against Capital Partners, Construction Partners, Jenks, Glasser, Modern and Boggus)

**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. §501.201)**

75. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

76. This is an action for violation of Chapter 501, Florida Statutes, known as the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

77. Under Florida Statues, unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

78. The Defendants, Capital Partners, Construction Partners, Jenks, Glaser Modern and Boggus, have committed a series of acts or practices that are unfair, deceptive, or unconscionable in willful violation of Chapter 501, Pait II, Florida Statutes,

including but not limited to:

a. Obtaining title to the Plaintiffs' Properties under false pretenses;

b. Falsely promising to initiate work on the Properties and complete work within a reasonable period of time;

c. Falsely promising obtain financing for the Properties as needed, and instead obtained financing for all Properties while constructively abandoning the "projects" while simultaneously charging the interest on the financing to the Plaintiff without any work being done;

d. Keeping the deposit, the mortgage proceeds, obtaining a large mortgage divesting the property of equity, making the Plaintiff pay advance costs and monthly mortgage payment while delaying the project.

79. Under Florida law, it is unlawful for a developer, such as the Defendants, to obtain title of a consumer(s) real property using financing as a pretext and removing all possible equity and leverage from Plaintiff.

80. The Defendants made misrepresentations to the Plaintiffs in order to induce them to execute the Construction Contract(s) and Addenda, representations which were by all means negligently, deceptively, aud/or unfairly made and done for the sole purpose of having the Plaintiffs execute the Construction Contract(s) and transfer title to the Properties over to the Defendants.

81. The Defendants knew or should have known that it was misleading the Plaintiffs under the circumstances, by choosing to stay silent about the pertinent information described above in detail.

82. The Defendants knew or should have known that the misrepresentations made to the Plaintiffs would induce the Plaintiffs to sign the Construction Contract(s) and subsequent Addenda for the construction and/or improvement(s) of the Properties and the subsequent transfer of title to the Properties by the Plaintiff to the Defendants.

83. The Plaintiffs relied to their detriment on the Defendants' representations and have been damaged as a direct and proximate result of the foregoing negligent misrepresentations.

**WHEREFORE,** Plaintiff demand judgment against the Defendants and pray that the Court award Plaintiff actual damages, compensatory damages, incidental damages, statutory damages, disgorgement of profits, restitution, and attorneys' fees and costs if awardable by law, and such other and further relief which this court deems just, necessary, and proper.

**COUNT V**
(against Capital Partners, Construction Partners, Jenks, Glasser and Boggus)
**VIOLATION OF FLORIDA CONSUMER COLLECTION PRACTICES ACT**

84. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

85. This is an action for violation of the Florida Consumer Collection Practices Act (FCCPA), sections 559.55 to 559.785, Florida Statutes.

86. The Defendants violated Fla. Stat. § 559.72(9) by, including but not limited to, purporting to act as a lender and/or financier for the Plaintiff.

87. The Defendants, Capital Partners, Construction Partners, Jenks, Glasser and

Boggus are not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission and are thus not excluded from the FCCPA.

88. The Defendants, are not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission and is thus not excluded from the FCCPA.

89. As a direct and proximate result of the Defendants' actions, inactions, and/or misconduct, the Plaintiffs have been damaged.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and prays that the Court award Plaintiffs actual damages, compensatory damages, incidental damages, statutory damages, disgorgement of profits, restitution, and attorneys' fees and costs if awardable by law, and such other relief which this court deems just, necessary, and proper.

**COUNT VI**
**CIVIL CONSPIRACY**
(against Capital Partners, Construction Partners, Jenks, Modern, Glasser, IFP and Boggus)

90. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.
91. This is an action for the independent tort of conspiracy.
92. The Defendants wrongfully and with full actual knowledge, conspired, using a peculiar power of coercion created by virtue of their contractual position and the control exercised over the Plaintiff and his real property.
93. The Defendants conspired to obtain and retain title to the Properties.
94. The Defendants, upon obtaining title to the Properties, conspired to collect the deposit,

making it non-refundable, and later transfer the title of the properties, forcing Plaintiff to pay the advance costs of the loan and the monthly loan payments, even when Plaintiff was not the owner of the property.

95. Defendants also conspired to obtain a loan amount that was not determined based in the actual value of the undeveloped properties, but instead based on a blanket or bulk agreement reached with IFP. By doing this, the Defendants divested Plaintiff of the value of his properties.

96. Defendants also delayed the project, which is still not completed while Plaintiff continues paying interests in loans for properties he does not own.

97. Plaintiffs have lost all leverage, having lost title to the properties, being burdened with mortgage payments and a mortgage balance which erased all equity.

98. Defendants have engaged in many unlawful overt acts in furtherance of the conspiracy, as described above in detail.

99. The Plaintiff has been directly and proximately damaged as a result of the foregoing conspiracy, which could only have been accomplished with the full and active concert of all the Defendants.

**COUNT VII**
**QUIET TITLE LOT 24**
(against Construction Partners, Modern and IFP)

100. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

101. This is an action to Quiet Title to real Property located in Charlotte County, Florida pursuant to Florida Statutes Section 65.021.

102. Plaintiff owns the following described real property (the "Property") located in

Charlotte County, Florida:

Lot 24, Block 23, ROTONDA SANDS NORTH REPLAT, UNIT 1, a subdivision according to the Plat thereof, recorded in Plat Book 11, Pages 4A through 4Z2, of the Public Records of Charlotte County, Florida

103. Plaintiff deraigns his title as follows: American Prime, LLC deeded Lot 24 and 25 through a Special Warranty Deed recorded on August 25, 2017, in O.R. Book 4233, at Pages 207 and 208 of the Public Records of Charlotte County, Florida.

104. There is a fraudulent and illegal Quit-Claim Deed, which was created and recorded in violation of Fla. Stat. 695.03 and Fla. Stat. 117.107. This Quit-Claim Deed was the result of fraud exerted upon the Plaintiff and the County Recording Office and was recorded on August 1, 2022, in O.R. Book 5027, at Pages 1193 and 1194 of the Public Records of Charlotte County, Florida.

105. There is a fraudulent and illegal Quit-Claim Deed, which was created and recorded by the grantee of the Quit Claim Deeds described in paragraph 105 above. This Quit-Claim Deed is void as a result of the previous fraudulent deed in the chain of title. It was recorded on August 9, 2022, in O.R. Book 5031, at Pages 2026 and 2027 of the Public Records of Charlotte County, Florida.

106. There is a fraudulent and illegal Corrective Quit-Claim Deed, which was created and recorded by the grantee of the Quit Claim Deeds described in paragraph 105 above. This Corrective Quit-Claim Deed is void as a result of the previous fraudulent deeds in the chain of title. It was recorded on November 4, 2022, in O.R. Book 5066, at Pages 954 and 955 of the Public Records of Charlotte County, Florida.

107. There is an invalid and fraudulent Mortgage executed by Modern Builders, Inc.,

to IFP FUND I, LLC, recorded on November 4, 2022, in O.R. Book 5066, at Page 956 through 975 of the Public Records of Charlotte County, Florida, in the original principal amount of $322,000.00. This Mortgage is invalid as a result of the defects described above in the chain of title and the lack of authority of the mortgagor.

108. In order for Plaintiff to obtain clear title to the subject property, it is necessary that this suit be brought to foreclose the right of Defendant, IFP FUND I, LLC.

WHEREFORE, Plaintiff demands judgment against Defendants Construction Partners, Modern and IFP removing the Quit-Claim Deeds and Mortgage identified above, and quieting the title in the Plaintiff with respect to those instruments.

**COUNT VIII**
**QUIET TITLE LOT 25**
(against Construction Partners, Modern and IFP)

109. The Plaintiff restates, adopts, and incorporates by reference Paragraphs 1-46 above, as if fully set forth herein.

110. This is an action to Quiet Title to real Property located in Charlotte County, Florida pursuant to Florida Statutes Section 65.021.

111. Plaintiff owns the following described real property (the "Property") located in Charlotte County, Florida:

> Lot 25, Block 23, ROTONDA SANDS NORTH REPLAT, UNIT 1, a subdivision according to the Plat thereof, recorded in Plat Book 11, Pages 4A through 4Z2, of the Public Records of Charlotte County, Florida

112. Plaintiff deraigns his title as follows: American Prime, LLC deeded Lot 24 and 25 through a Special Warranty Deed recorded on August 25, 2017, in O.R. Book 4233, at Pages 207 and 208 of the Public Records of Charlotte County, Florida.

113. There is a fraudulent and illegal Quit-Claim Deed, which was created and recorded in violation of Fla. Stat. 695.03 and Fla. Stat. 117.107. This Quit-Claim

Deed was the result of fraud exerted upon the Plaintiff and the County Recording Office and was recorded on August 1, 2022, in O.R. Book 5027, at Pages 1191 and 1192 of the Public Records of Charlotte County, Florida.

114. There is a fraudulent and illegal Quit-Claim Deed, which was created and recorded by the grantee of the Quit Claim Deeds described in paragraph 114 above. This Quit-Claim Deed is void as a result of the previous fraudulent deed in the chain of title. It was recorded on August 9, 2022, in O.R. Book 5031, at Pages 2028 and 2029 of the Public Records of Charlotte County, Florida.

115. There is a fraudulent and illegal Corrective Quit-Claim Deed, which was created and recorded by the grantee of the Quit Claim Deeds described in paragraph 114 above. This Corrective Quit-Claim Deed is void as a result of the previous fraudulent deeds in the chain of title. It was recorded on November 4, 2022, in O.R. Book 5066, at Pages 1110 and 1112 of the Public Records of Charlotte County, Florida.

116. There is a fraudulent and illegal Corrective Quit-Claim Deed, which was created and recorded in violation of Fla. Stat. 695.03 and Fla. Stat. 117.107. This Quit-Claim Deed was the result of fraud exerted upon the Plaintiff and the County Recording Office. Additionally, this Corrective Quit-Claim Deed is void as a result of the previous fraudulent deeds in the chain of title. It was recorded on November 4, 2022, in O.R. Book 5066, at Pages 952 and 953 of the Public Records of Charlotte County, Florida.

117. There is an invalid and fraudulent Mortgage executed by Modern Builders, Inc., to IFP FUND I, LLC, recorded on November 4, 2022, in O.R. Book 5066, at Page 1112

through 1131 of the Public Records of Charlotte County, Florida, in the original principal amount of $322,000.00. This Mortgage is invalid as a result of the defects described above in the chain of title and the lack of authority of the mortgagor.

118. In order for Plaintiff to obtain clear title to the subject property, it is necessary that this suit be brought to foreclose the right of Defendant, IFP FUND I, LLC.

WHEREFORE, Plaintiff demands judgment against Defendants Construction Partners, Modern and IFP removing the Quit-Claim Deeds and Mortgage identified above, and quieting the title in the Plaintiff with respect to those instruments.

**REQUEST FOR ATTORNEY FEES AND COSTS**

The Plaintiff has retained the undersigned counsel to represent it in this action and has agreed to pay a reasonable attorney fee and costs for the defense. The Plaintiff requests an award of reasonable attorney fees and costs as required by the above causes of action and allowed for under Fla. Stat.§ 57.105, and any other applicable rules or statutes under Florida law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

**DATED** this 2ND day of October, 2024.

By: /s/Claudio R. Cedrez Pellegrino

Claudio R. Cedrez Pellegrino
Respectfully submitted,
*/s/Claudio R. Cedrez Pellegrino*
Claudio R. Cedrez Pellegrino, Esq.
Bar No. 43521
Attorney for Plaintiff
11098 Biscayne Blvd.
Suite 100A
Miami, Florida 33161

Tel: 305 763-8678 Fax: 786 664-6596
Email: ccedrez@cedrezlaw.com
Service Email: eservice@cedrezlaw.com

Exhibit A

**FRONTLINE CONSTRUCTION PARTNERS**

CONSTRUCTION CONTRACT
(For Use Where Construction is on Owner's Property)

JOB #: 1RS008

THIS CONSTRUCTION CONTRACT, made and executed on this date **October 29, 2021**, by and between:

**BEVILACQUA CLAUDIO ALEJANDRO,**

(hereinafter referred to as "Owner"), whose mailing address is:

**690 Lincoln Rd # 300, Miami Beach, FL 33139,**

and Frontline Construction Partners, LLC (hereinafter referred to as "Contractor"), whose mailing address is 1267 2nd St. Sarasota, FL 34236 and whose Certified Residential Contractor License is CRC058398, which parties for good and valuable consideration each to the other, the receipt and sufficiency of which is conclusively acknowledged, do hereby agree as follows:

1. **DESCRIPTION OF PROPERTY AND WORK TO BE PERFORMED.** Contractor agrees to construct improvements on Owner's real property located at: **24 COXSWAINE CIRCLE, PLACIDA, FL 33946**, in accordance with this Contract and the additional contract documents attached hereto, as indicated in paragraph 28 hereof.

The Parcel ID Number of the Subject Property is **412131179012**

**ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001 – 713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID-IN-FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.**

**2. CONTRACT PRICE.** Owner agrees to pay Contractor the following Contract Price, together with adjustments, if any, for Change Orders as described in paragraph 10, and for any material costs increases as described in paragraph 30, if applicable, and for Allowances and Exclusions as described in Exhibit B, if applicable, in accordance with the further provisions of this Contract. Total Contract Price is subject to increases in costs if commencement of construction is delayed by any act or omission of the owner for more than ninety 90 days from date of this agreement.

| | |
|---|---|
| **Contract Price** | **$ 338,900.00** |
| Subject Property Lot | **$ 0.00** |
| Additions to Contract Price (per Job Summary) | **$ 2,110.00** |
| **Total Contract Price** | **$ 341,010.00** |

**3. DEPOSIT.** Upon the execution of this Contract, Owner shall pay Contractor a deposit as outlined below:

Deposits

| | | | | |
|---|---|---|---|---|
| | Initial Deposit due at Signing | October 29, 2021 | $ 51,151.50 | |
| If applicable, | Additional deposit due on or before | | $ 0.00 | |
| Total Deposits | | | $ 51,151.50 | |
| Balance Due | | | | $ 289,858.50 |

<u>N/A</u> Owner requires construction loan financing - When Owner requires construction loan financing, the deposit is refundable, less contractor's costs, in the event Owner fails to obtain construction loan financing in the minimum amount of the balance to close provided that the Owner makes complete loan application within five (5) business days of the date of this agreement, actively pursues same in good faith, and obtains a binding loan commitment within thirty (30) days of the date of this agreement, which commitment requires a loan closing thereof within thirty (30) days thereafter. Loan closing is required within 60 days from the date of this agreement. In order for the Owner to receive a deposit refund, less Contractor's costs, the Owner must be unable to obtain a binding loan commitment within the time frames and the Contractor must receive a written notice from the lender within the 30 day deadline, stating that the Owner cannot obtain financing for the minimum amount. If the Owner cancels the Contract for any reason subsequent to these time frames your entire deposit is non-refundable, notwithstanding any other provision.

<u>X</u> Owner does not require financing - When Owner does not require construction loan financing, the deposit is non-refundable.

4. **DEFINITIONS.** The term "cost" means all costs and amounts paid or incurred to third persons by Contractor or by Owner for labor, services, materials, licenses and permits directly related to this Contract. This term shall also include the gross payments to all employees of Contractor for work performed by such employees pursuant to or in preparation of this Contract or in preparation of the plans and specifications referred to herein, (including the income taxes and F.I.C.A. taxes withheld thereon). The term "days" means calendar days, including weekends and holidays, unless otherwise noted; "business days" means weekdays Monday through Friday, which are not legal state holidays. "Commencement of construction" is defined as meaning the date on which footings are poured or, in the case of monolithic footings and slab, the day rough plumbing has begun. "Substantial completion" occurs when the Certificate of Occupancy has been issued or has been delayed solely by act or omission of the owner; or, when the owner occupies the Subject Property. "Consequential damages" consists of costs or expenses which may arise from the special circumstances of either party hereto, including, but not limited to, such things as increases in living expenses, additional storage or interests costs, adverse or aggravated medical conditions or longer travel times and distances, which may be incurred or suffered as a result of, or arising from, a delay in any performance hereunder by either party. "Date of this agreement" and "contract execution date" is defined as the executed date located within the first paragraph of the Contract.

5. **LICENSES AND PERMITS.** Contractor and Owner agree that each party shall obtain and pay for the following licenses, permits or related items as indicated, if required. Unless otherwise indicated, the responsibility for obtaining any license or permit includes the responsibility for obtaining all governmental licenses or permits, if required. In the event that Contractor is unable to obtain all necessary licenses, approvals and permits required to do the work within 120 days from the date of this Contract, then Contractor shall have the option of terminating this Contract and returning all monies paid to Contractor by Owner, less Contractor's costs. If the initial deposit paid by the Owner as stated in paragraphs 3 and 6 of this Contract is more than 10% of the total Contract Price as stated in paragraph 2 of this Contract, then the Owner is entitled pursuant to Florida Statute Section 489.126(2) to have Contractor apply for all permits, necessary to do the work to be performed (as detailed in paragraph 1 of this Contract) within 30 days after the date initial deposit is made and to commence work within 90 days after the date all necessary permits for work are issued, unless the Owner agrees in writing to a longer period as to either time frame or both. Owner hereby agrees to allow Contractor 120 days to apply for all necessary permits, if the Owner's initial deposit is greater than 10 percent. Such amounts are to be paid and the license or permit obtained as and when Contractor needs such licenses or permits to complete the work described in this Contract by the following:

| DESCRIPTION OF LICENSE OR PERMIT | | CONTRACTOR | OWNER |
|---|---|---|---|
| a) | Home Owner's Association Approval (if applicable) | X | |
| b) | Building Permit | X | |
| c) | Survey | X | |
| d) | Sewer Systems/Septic Permit (if applicable) | X | |
| e) | Flood Elevation Certificate (if applicable) | X | |
| f) | Other () | | |
| g) | Other () | | |

**6. TIME OF PAYMENT; INTEREST DUE.** Owner agrees to pay Contractor the Contract Price specified in paragraph 2, in accordance with:

**N/A** **Lender's Required Draw Schedule**
Lender:
Owner agrees that the construction loan financing obtained by the Owner does not require the Owner (borrower) to request, release, and/or authorize any construction loan draw disbursement to the Contractor. Owner agrees that the construction loan financing obtained by the Owner does not require the use of checks made payable jointly to the Owner (borrower) and Contractor. This applies to all construction loan draw disbursements prior to the final construction loan draw disbursement.

**X** **Cash/Draw Payment Schedule**

Any amounts due to the Contractor are due within 3 business days of request. In the event any amounts due to the Contractor remain unpaid for more than ten (10) days after the due date thereof, then, and in such event, such amounts shall bear interests thereafter at the rate of 1.5% per month until payment in full has been made and the Total Contract Price may be subject to an increase from increased costs and Owner shall be in default under the contract.

**7. DRAW REQUESTS.** At such times as Contractor completes each of the items set forth in the draw schedule Contractor shall submit a written draw request by letter or email to Owner or to Owner's Lender, as applicable, for an amount equal to the percentage of the Contract Price applicable to each item of construction then completed, less the percentage previously requested and paid for each such items. All draw requests are due and payable within 3 days of request. If requested by Owner or Owner's Lender, Contractor will provide Owner or Owner's Lender with a partial lien release, dated no more than 45 days prior to the draw request, or a final lien release from each entity that has served a Notice to Owner.

**8. FINANCING.** It shall be the responsibility of the Owner to pay the construction loan interest. It shall be the sole responsibility of Owner to obtain any financing necessary to create and maintain a draw account deposit sufficient to make all the payments set forth in this Contract, and Owner shall have sole responsibility to pay all fees, charges or other costs of such financing, including inspection fees charged by any such lender. The nonperformance of any such lender shall not affect the obligation of Owner to Contractor; provided, however, the draw schedule designated by the construction loan lender shall supersede and replace the draw schedule set forth herein. In the event any portion of the Contract Price is to be paid from the proceeds of a construction loan, Owner agrees to provide Contractor with written verification of a construction loan commitment, subject only to standard conditions, as a condition precedent to Contractor beginning any work. The Contractor is not obligated to begin work until such time as: (A) a Notice of Commencement has been recorded; and, (B) the Owner has obtained a construction loan, which, when added to Owners funds paid to Contractor or on deposit for payment to Contractor, is in the amount of not less than the Contract Price, the terms of which will permit the Contractor to submit draw requests directly to the lender or owner in accordance with the draw schedule in paragraph 6 of this Contract or the draw schedule in the loan documents. In addition, Contractor may cease construction work at such times, and from time to time, if the balance in the draw account is ever less than the balance of the Contract Price then due for completion, plus any increased costs for all change orders.

**9. TIMES AND MANNER OF PERFORMANCE BY CONTRACTOR.** Contractor shall make a reasonable effort to commence work within thirty (30) days of the issuance of all building permits and verification from Owner in writing that all funds necessary for payment of the Contract Price are available, whichever shall last occur. Contractor shall diligently pursue and substantially complete all work to be performed under this Contract within a reasonable period of time, taking into consideration delays that are beyond the control of the Contractor, including, but not limited to, weather conditions, delays in selection or delivery of materials, change orders requested by Owner and delays in obtaining all necessary licenses or permits or the certificate of occupancy. Owner is not to rely on any oral representations from the Contractor or its subcontractors with regard to when substantial completion will occur. Contractor shall not be liable to Owner for any losses, costs or damages resulting from or arising out of a delay or inability to perform this Contract as described herein or caused by any event beyond the control of the contractor.

**10. CHANGE ORDERS.** Owner may request changes to the plans, specifications or selection of finished material subject to Contractor's approval. **Changes that require, per government regulations, amending the plans and specifications in order to obtain a building permit may only be requested within 21 days from this agreement.** Changes that do not require, per government regulations, amending the plans and specifications in order to obtain a building permit may only be requested by Owner and approved by Contractor will be subject to a Three Hundred and No/100 Dollars ($300.00) non-refundable, cash processing fee after the 3rd Change Order has been executed. Owner shall pay to Contractor any increase in Contract Price prior to the work being performed, or as set forth in the Change Order. Any increase to the Contract Price, additional costs, or Allowance overages, Contractor shall be entitled to recover from Owner the amount stated therein plus a minimum of 18%. To the extent that additional work is performed, or materials delivered at the Owner's request which is not the subject of a signed Change Order, the Contractor shall be entitled to recover from Owner the amount stated therein, or, if no amount is stated, the costs thereof, plus 18%.

**11. FINAL INSPECTION/PUNCH LIST.** Within five (5) days of notification by Contractor that all work is substantially complete, Owner shall conduct a final inspection of the improvements and prepare a punch list, which, if agreeable, shall be signed and dated by both parties. Contractor shall be responsible for completion of all items on the punch list; provided, however, even if there are punch list items yet to be completed, the Contractor shall be entitled to receive all remaining amounts due under this Contract. The final inspection and completion of the punch list shall constitute the Owner's unconditional acceptance of the property as built without regard to the variations or differences between the property and the model home and/or drawings, renderings, or plans viewed as examples by the Owner.

**12. OCCUPANCY.** Owner hereby grants to Contractor an exclusive leasehold on the real property described herein, effective upon execution of this agreement and continuing until substantial completion of construction, and payment in full to the Contractor. Owner shall not occupy the structure or move any personal property onto the property until the Contract Price, including any increases as the result of change orders, are paid in full to the Contractor. In the event Owner occupies the property prior to making final payment to the Contractor, then Owner shall be deemed to have APPROVED AND ACCEPTED all labor, services and materials, as well as Contractor's performance hereunder as being complete. In addition, any such occupancy by the Owner or authorized by the Owner, shall result in the Owner being obligated to pay rent to the Contractor at the rate of one percent (1%) of the Contract Price for each month or portion thereof that any such occupancy continues until the Contract Price, as adjusted by any change orders, has been paid in full to the Contractor.

**13. USE OF CONTRACTOR'S EMPLOYEES, AGENTS, SUBCONTRACTORS, OR MATERIAL SUPPLIERS.** Owner and Owner's family members or agents shall not in any manner, utilize, unreasonably interfere, communicate, or contract with Contractor's employees, subcontractors, subcontractor's employees or agents, or material suppliers, nor perform or permit any work on the Subject Property, without the prior written approval of the Contractor, which approval may be withheld in the Contractor's unrestricted discretion; provided, however, that if such consent is given, then Owner shall be solely responsible for the payment, shipment, delivery, insurance, installation, and damages for delay arising therefrom.

**14. WARRANTIES BY CONTRACTOR. CONTRACTOR MAKES NO EXPRESS OR IMPLIED WARRANTIES, EXCEPT AS STATED HEREIN. ALL STATED WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED.**

(a) Owner acknowledges the opportunity, either at the time of the execution of this document, at the time of contract with Contractor, and/or during the construction of the home, to review the terms and conditions of the Home Buyers Warranty Corporation (2-10 HBW) 2-10 Warranty Document(s) available to me through the Contractor or 2-10 HBW. If, for any reason, Owner has not received or have not had an opportunity to review a copy of the Warranty Document(s), Owner must obtain a copy of it by requesting the Warranty Document in writing from 2-10 HBW. Mail request to Home Buyers Warranty Corporation; Warranty Administration Office; 10375 East Harvard Ave, Denver, CO 80231. Should Owner choose not to obtain a copy of same from 2-10 HBW or choose not to review the Warranty Document(s) at the times listed above, Owner hereby waives the right to later assert any inapplicability of the terms and conditions of the Warranty Document(s).

Owner understands that if and when the new home warranty is issued, it is an Express Limited Warranty, not an insurance policy and any and all claims, whether contractual or otherwise, are controlled by the express terms, conditions and exclusions contained in the Warranty Document. Certain items and events are not covered by this warranty. Refer to the section title "Exclusions" in the Warranty Document.

Owner is responsible for signing and returning to Contractor the new home warranty application within 15 days of the Certificate of Occupancy. Owner acknowledges that the new home warranty cannot be issued without the signed and returned application. Once the new home warranty application has been received by Contractor, within the allotted time, Owner acknowledges that the new home warranty goes into effect the date the Certificate of Occupancy is issued.

Any other warranty or warranties, whether express or implied, are disclaimed by Contractor and waived by Owner, unless otherwise prohibited by particular state law.

(b) Owner acknowledges that minor changes may occur in the drafting process, which may result in the loss or gain of square footage in the Residence. Owner shall not be entitled to any credits against or reductions in the contract price as a result of such changes.

(c) MOLD IS A NATURALLY OCCURRING GROWTH THAT MAY HAVE ADVERSE HEALTH CONSEQUENCES AND WHICH REQUIRES CERTAIN PREVENTATIVE AND PROPER MAINTENANCE ACTIONS BY THE OWNER. ACCORDINGLY, CONTRACTOR ASSUMES NO LIABILITY WHATSOEVER FROM ANY HARM TO INDIVIDUALS AND DAMAGES TO PROPERTY ARISING AS A RESULT OF MOLD UNRELATED TO CONSTRUCTION DEFECTS.

(d) Contractor disclaims, and Owner waives, all warranties expressed or implied concerning all plant material including trees, shrubs, and sod either on the home site or on nearby property. This includes any native plant material or any plant material planted by the Contractor.

**15. TITLE TO PROPERTY, SURVEY, PLACEMENT OF STRUCTURE AND BUILDING SITE.** Owner warrants and represents to Contractor that Owner has fee simple marketable title to the subject property, free and clear of all liens or encumbrances. Owner agrees to tender to Contractor a Certificate of Title clearly showing Owner as the record titleholder of the real property within 5 days of this Agreement. Owner further warrants that Owner has legal right of access to the Subject Property and all rights of title, including easements necessary for the construction, use and occupancy of the structure. It shall be the sole responsibility of Owner to mark the boundaries of the Subject Property and the location on such property where the structure is to be constructed. Any loss or damage suffered by Contractor or any third party as the result of a defect in title or incorrect designation of the boundaries or location of the structure shall be borne solely by Owner. In the event any governmental regulations or private restrictions or covenants, or the results of any soil or subsurface tests requires modifications to the structure or to the subsurface, the cost of such modifications shall be added to the Contract Price and are payable in the same manner as if originally included in the Contract Price, or, at contractor's option, due and payable at the time the costs of such modifications are incurred. Owner shall provide a clear, accessible building site, correctly zoned and otherwise allowable for the improvements to be made.

**16. PLANS AND SPECIFICATIONS.** The Contractor has provided the plans and specifications, and any loss, cost, damage or expense incurred by the other party as the result of any defects in such plans and specifications shall be borne by the party providing the plans and specifications. In the event of a conflict between the plans and specifications, the specifications shall control. In the event of a conflict between the plans, specifications and contract documents, the contract documents shall control. Notwithstanding the foregoing, the plans and specifications for the residence are subject to any changes necessitated by building code revisions or other governmental regulations. The content and concept contained within Contractor's documents and design plans belong to and remain the Intellectual Property of Contractor. Documents or designs may not be dispersed, shared or used by any other person(s) or entity without the written consent of Contractor.

**17. INSURANCE.** Contractor shall, at Contractor's expense, maintain all insurance required by law, including general liability, but not flood insurance, in connection with the work to be performed under this Contract. In addition, Contractor shall, at Contractor's expense, during the period of construction and until issuance of a certificate of occupancy or until the Contractor's earlier termination of work, maintain a builders risk insurance policy for property damage, theft and vandalism equal to the Contract Price, but not including land, or other improvements, including but not limited to, pool, docks, walls or fencing. Contractor shall provide for such coverage at Contractor's expense. Any insurance payment to the Owner for work performed by the Contractor shall be paid to the Contractor. Contractor is not responsible for providing flood insurance.

**18. RIGHT-TO-CURE.** FLORIDA LAW (CHAPTER 558, FLORIDA STATUTES) CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTORS, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

**19. DEFAULT / NOTICE OF DEFAULT.** Other than for claims of defective construction, which are governed solely by the "right-to- cure" laws disclosed in paragraph 20, Contractor shall be in default under this Contract if Contractor abandons work on the structure or otherwise refuse to carry out his obligations under this Contract (unless such abandonment or refusal is based upon a prior default by Owner which Owner has failed to cure after written notice thereof). Contractor shall be deemed to have abandoned work if Contractor shall fail to perform or cause any work to be performed on the Subject Property for sixty (60) consecutive days, unless such failure is the result of any event beyond the control of the Contractor. Owner shall be in default under this Contract if Owner refuses to permit Contractor to complete performance, fail to pay any amounts when due, or otherwise refuses to carry out the obligations of Owner under this Contract (unless such refusal or nonpayment is based upon a prior default by Contractor which Contractor has failed to cure after written notice thereof). In the event of default, the defaulting party shall be entitled to receive written notice, by certified mail return receipt requested or by hand delivery to the address shown below, which specifies the event(s) of default. The defaulting party shall have ten (10) days from the receipt of the notice in which to begin the curing of any default, which actions shall be continuously pursued and completed within a reasonable time in of light the nature of the default; provided, however, the cure of any default in payment must be completed within ten (10) days from the date of notice of default. If any default is timely cured, each party agrees that this Contract shall remain in full force and effect and neither party may assert any claims as the result of such default. All notices shall be to the respective addresses of the parties as follows, or as otherwise set forth in written notice to the other party:

<u>(a) As to CONTRACTOR:</u>
Frontline Construction Partners, LLC
1267 2nd St
Sarasota, FL 34236

<u>(b) As to OWNER:</u>
**Claudio A. Bevilacqua**
**690 Lincoln Rd # 300**
**Miami Beach, FL 33139**

**20. REMEDIES AFTER DEFAULT:**

(a) BY CONTRACTOR. Except for claims by the Owner of defective construction, which are governed solely by the "right-to-cure" law disclosed in paragraph 20, in the event of default by Contractor which is not cured within the time specified, the Owner may, at Owner's option, declare the Contract terminated and seek damages only for the reasonable and necessary costs to complete construction in accordance with the original plans and specifications and for the Contract Price (adjusted by Change Orders to the date of termination), less any balance of the adjusted Contract Price not paid to Contractor, and excluding any other damages whatsoever, such as: damages for delay, or for any consequential damages.

(b) BY OWNER. In the event of default by Owner which is not cured within the time specified, the Contractor, at Contractor's option, shall: (1) provide a notice of default, upon which contractor shall be entitled to all costs incurred by Contractor together with profits in the amount of fifteen (15%) percent of the total contract price , and excluding any other damages whatsoever, such as: damages for delay, or for any consequential damage; or (2) may complete the construction and seek damages for breach of contract. The parties have agreed to this liquidated damage provision due to the difficulties and uncertainties associated with the calculation of actual damages for lost profits which Contractor is likely to incur as the result of a default by Owner.

**21. VENUE AND JURISDICTION.** Except for claims by the Owner of defective construction, which are governed solely by the "right-to- cure" law disclosed in paragraph 20, the parties agree that any and all claims, disputes and controversies between the Owner and Contractor arising from or related to the subject home identified herein, or to any defect in or to the subject home or the real property on which the subject home is situated, or the sale of the subject home by seller, including but not limited to, any claim for breach of contract, negligent or intentional misrepresentation, shall be submitted to a Florida court of competent jurisdiction in the county where the work was to be performed as described in paragraph 1.

The aforementioned also applies to any and all claims, disputes and controversies between the Owner and Contractor prior to Substantial Completion..

**22. ATTORNEY FEES.** In the event of any disputes arising out of or in connection with this contract, the prevailing party therein shall be entitled to recover reasonable attorney fees and costs, whether same were incurred prior to or during any judicial proceedings, including, but not limited to, any trial or appellate proceedings, as well as prior to or during any of the alternative dispute resolution mechanisms, whether described in paragraphs 20 and 23 or otherwise ordered by a court of competent jurisdiction.

**23. GOVERNING LAW, ASSIGNMENT AND RECORDING.** This Contract shall be construed and enforced in accordance with the laws of the State of Florida and may not be assigned or recorded except with the prior approval of both parties, which approval may be withheld for any reason whatsoever.

**24. INTEGRATION CLAUSE.** This Contract and the additional contract documents attached hereto, as indicated in paragraph 28 hereof, constitute the complete agreement between the parties and may not be modified except in writing signed by all parties hereto. ORAL REPRESENTATIONS BY EITHER PARTY ARE NOT BINDING AND SHOULD NOT BE RELIED UPON.

**25. CONSTRUCTION INDUSTRIES RECOVERY FUND.** PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:

Construction Industry Licensing Board
1940 N. Monroe Street
Tallahassee, Florida, 32399-0784.
850-487-2252

**26. ADDITIONAL CONTRACT DOCUMENTS.** If marked, the following additional documents are a part hereof and each party acknowledges receipt of a copy thereof:

X Job Summary

X Cash/Draw Payment Schedule Addendum

X Mold Notice, Disclosure, and Disclaimer

**27. CONTROLLING PROVISIONS AND HEADINGS.** All handwritten or typewritten provisions herein shall control over any printed provisions in conflict therewith, unless otherwise provided. The headings on each paragraph are for

the sole convenience of the parties and shall not be construed to be a part of this Contract.

**28. INCREASES IN MATERIALS COSTS.** In the event that, during construction of the improvement described herein, Contractor's costs for materials used or to be used herein are increased by more than 2% over the Contractor's costs for same at the time this agreement was signed, for any cause(s) and this includes any increase in costs that are a result of construction delays, then, and in such event(s), Contractor shall have the right to pass the entire amount of materials costs increase(s) along to owner by adding the total amount(s) thereof to the Contract Price.

**29. SPECIAL CLAUSES** (If "none," leave blank):

**30. INSULATION DISCLOSURE.** In accordance with 16 C.F.R., Chapter 1, Section 460.16, the following disclosure is made regarding the insulation, which has been or will be installed in the improvements described herein, as follows (if known):

| Location | Type | Thickness | Manufacturer's R-Value |
|---|---|---|---|
| Exterior Walls | Fi-Foil | N/A | R=4.1 |
| Interior Walls | None | | |
| Flat Ceiling | Fiberglass | 9.5" | R=30 |
| Sloped Ceiling | Fiberglass | 11.5" | R=30 |
| Framed Wall 2nd Floor | Fiberglass | 3.5" | R=11 |
| Framed Wall @ Garage | Fiberglass | 3.5" | R=11 |

**Note:** If any of the above information is incomplete, it is either because this information has already been included in the plans or specifications identified herein, or because this information is unknown at the time this agreement was entered into. However, if any of the above information is incomplete and has not been included in the plans or specifications identified herein, then it will be furnished to the Buyer when the information becomes available. Buyer hereby acknowledges that this R-value information is based solely upon information supplied by the manufacturer or installer and that Contractor does not represent or warrant the accuracy of this information. Buyer further acknowledges that the actual R-values may vary based upon normal construction variances in insulation thickness and openings in walls.

**31. WAVIER OF STATUTORY RIGHT TO ESCROW.** PURSUANT TO SECTION 501.1375, FLORIDA STATUTES, IF CONTRACTOR BUILDS MORE THAN TEN (10) RESIDENTIAL UNITS PER YEAR, THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER. BY SIGNING THIS AGREEMENT, OWNER DOES HEREBY WAIVE THIS STATUTORY RIGHT.

**32. INDEMNIFICATION.** In consideration of the first One Hundred and No/100 Dollars ($100.00) to be paid hereunder and to the fullest extent permitted by law, Owner agrees to indemnify, hold harmless, and defend Contractor and its agents, servants, and employees, from and against any and all claims, costs, expenses, or liability (including attorneys' fees), attributable to bodily injury, sickness, disease, or death, or to damage to, or destruction of property (including loss of use thereof) caused by, arising out of, resulting from, or occurring in connection with the performance of the work by Owner, Owner's other contractors, their agents, servants, or employees. Owner's obligation hereunder shall only be limited to the extent of the monetary limitations set forth herein and shall not be limited by the provision of any workers compensation or similar act. In addition, should any third party assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the work performed by Owner or its separate contractors or Owner's payment for said work, Owner shall indemnify, hold harmless, and defend Contractors, its agents, servants, and employees from and against any and all liability (including attorneys' fees), loss, damage, or expense arising out of or related to such claim, suit, action or proceeding. Owner's monetary obligation under this indemnification provision is specifically limited to the sum of the contract price. The parties hereby agree that the foregoing monetary limitation bears a reasonable commercial relationship to the contract and Project and constitutes a material part of the specifications for this Project. This indemnity clause is intended to comply with Florida laws on indemnity and, specifically, to comply with Florida Statute §725.06 and is to be interpreted in such a way as to be enforceable.

**33. INDEMNIFY SITE CONDITIONS.** Contractor shall not be responsible for any conditions found on Owner's lot, which were not caused by Contractor, including, but not limited to, any environmental conditions or contamination found thereon. Owner, in consideration of One and No/100 Dollars ($1.00) received from Contractor, hereby agrees to indemnify and hold Contractor harmless from any loss or claim arising out of any hazardous waste or other environmental conditions or contamination found on Owner's lot. Likewise, Contractor shall not be responsible for the water quality found at the single-family residence and releases Contractor from any and all claims relating thereto.

**34. CLOSING COSTS.** In addition to the Total Contract Price, Owner agrees to pay Closing Costs, including but not limited to, appraisal fees, credit reports, lender inspection fees, doc prep fees, recording fees, and city and county and state taxes and stamps on the mortgage and deed, loan origination and/or discount points.

**35. REAL ESTATE TAXES.** Taxes for the year closing will be prorated through the date of closing based on prior year assessment. Owner and Contractor agree that such a pro-ration is a sufficient estimation of taxes for the year of closing and no further proration will be made.

**36. CONSTRUCTION LOAN CLOSING.** Owner agrees that they will close on this transaction at the offices designated by the Contractor on the date and at the time set by the Contractor. Time is of the essence of this Agreement. If Owner is not ready, willing, or able, for any reason whatsoever, to close this transaction within 30 days of loan commitment or on the date set by the Contractor, whichever is later, this Agreement may be terminated or at Contractor's option, extended for a period of up to Thirty (30) days and the Total Contract Price is subject to increases in costs. If the Agreement is terminated based on the Owners' failure to close, the Contractor shall retain the Deposit as its liquidated damages and neither party shall have any further responsibilities under this Agreement.

**37. RIGHT TO ADAPT SITE CONDITIONS.** The shape of the home site and contours and elevations of the land may require Contractor to adapt the foundation, porch, patio, walkway, driveway, and garage of the new home to provide reasonable access and adequate drainage. Contractor has the right to grade, excavate or fill, or to remove native trees, shrubs, and ground cover during construction process.

**38. MATERIAL SUBSTITUTION.** Owner agrees that the Contractor in its sole discretion may substitute materials, product, specifications and/or fixtures for equal or better value or subject to change without notice. Changes may be necessary, required, authorized or approved by governmental authorities having jurisdiction.

**39. SELECTION OF DECORATING ITEMS.** Owner may select certain decorating items from among Contractor provided samples. **Owner agrees to complete selections <u>within 30 days of the date of this agreement.</u>** If the Owner fails to complete, the selection within the timeframe, at no fault of the Contractor, the Contractor will have the right to select the decorating items.

**40. PROPERTY ACCESS.** Owner shall not enter the property without the expressed written consent of Contractor. If Owner, their dependents, guests, companions, or invitees sustain any personal injury or property damage while on property, with or without Contractor's consent, Owner shall indemnify, defend and hold harmless the Contractor from any claim, loss, damage or expense arising from such personal injury or property damage, and purchasers, for themselves and heirs, hereby waive and relinquish any and all subrogation of any rights they might have arising from personal injury or property damage.

**41. RADON.** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of Radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding Radon and Radon testing may be obtained from the local county public health unit. Contractor makes no warranties and representations regarding whether or not Radon exists on the real property upon which the single-family residence is being constructed and is hereby released from any and all liability, which might arise from the presence of Radon.

**42. NOTICE OF RIGHT OF RESCISSION.** You have a legal right under Federal law to cancel this transaction, if you desire to do so, without any penalty or obligation within three business days from the above date or any later date on which all material disclosures required under the Truth in Lending Act have been given to you. If you so cancel the transaction, any lien, mortgage, or other security interest on your home arising from this transaction is automatically void. You are also entitled to receive a refund of any down payment or other consideration if you cancel. If you decide to cancel this transaction, you may do so by notifying the Contractor in writing at the above address.

**43. REAL ESTATE REPRESENTATION.** Contractor's sales representatives, or employees do not represent Owner in any capacity. Owner represents and warrants to Contractor that this transaction was not brought about by any real estate professional other than the Realtor and Realtor's Broker identified below. Owner shall indemnify and hold Contractor harmless from any liability or damage, including attorney's fees and court costs, in connection with any other claim for brokerage. Broker's commission shall be paid by Contractor.

**BROKER NAME: Zalaquett Group**
**BROKER ADDRESS: 690 Lincoln Rd #300, Miami, FL, 33139**
**REALTOR NAME: William Zalaquett**
**REALTOR EMAIL & PHONE #: william@thezalaquettgroup.com 786-606-7927**

**44. MISCELLANEOUS**

(a) This Agreement may not be assigned.
(b) Whenever the context shall so require, the singular shall include the plural, the masculine gender shall include the female and neuter, and visa-versa.
(c) This Agreement may not be modified except in written execution by both parties.
(d) If two or more persons are identified as Owners in this Agreement, any one of them shall have the right and authority to bind the other(s) in all matters relating to this Agreement.
(e) This Agreement is binding upon the Contractor only when executed by a duly authorized employee of the Contractor.
(f) This Agreement represents the entire Agreement between the parties hereto, and supersedes all prior agreements, which shall henceforth become null and void. There are no collateral agreements or understandings. Oral representations shall not be relied upon.
(g) This is to give you notice that FRONTLINE MORTGAGE PARTNERS, LLC, and MODERN BUILDERS REALTY L.L.C. has a business relationship with FRONTLINE CONSTRUCTION PARTNERS, LLC. Because of this relationship, this referral may provide FRONTLINE CONSTRUCTION PARTNERS, LLC a financial or other benefit.

OWNER(S):

Claudio Bevilacqua
Claudio Bevilacqua (Dec 18, 2021 12:14 GMT-3)

**BEVILACQUA CLAUDIO ALEJANDRO** — Dec 18, 2021 **Date**

________________________ **Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC**

Don Boggus (Dec 20, 2021 12:32 EST)

**Seller/Contractor License # CRC058398** — Dec 20, 2021 **Date**

Alicia Jenks

**Alicia Jenks** — Dec 20, 2021 **Date**

# FRONTLINE CONSTRUCTION PARTNERS

## Contract Job Summary Sheet

| BUYER: | BEVILACQUA CLAUDIO ALEJANDRO |
|---|---|

JOB ADDRESS: **24 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179012** JOB #: **1RS008** SALES PERSON:**Alicia Jenks**
MODEL NAME: **Manasota Luxury**

| BASE PRICE OF HOME: | **$ 338,900.00** |
|---|---|

OPTIONS

***Subdivision-Lot***

| | | |
|---|---|---|
| 109 | Lot Premium: 1RS008 (24 COXSWAINE CIRCLE, PLACIDA, FL 33946) | n/c |

***Subdivision-Lot***

| | | |
|---|---|---|
| 612067 | [ 1] Site Work Allowance - Level 1 - $20,000 | n/c |
| 612070 | [ 1] Culvert Allowance - $750 | n/c |
| 615006 | [ 1] Builder's Risk | n/c |
| 615008 | [ 1] Flood Insurance Not Included (if required) | n/c |
| 615012 | [ 1] Utilities Water - Public with 25'-0" Service Included | n/c |
| 615020 | [ 1] Utilities Sewer - Public with 25'-0" Service Included | n/c |
| 615028 | [ 1] Garage Left or Right Based on Electric Company's Closest Power Source with 25'-0" Service IncludedGarage Left or Right Based on Electric Company's Closest Power Source with 25'-0" Service Included | n/c |
| 615040 | [ 1] Additional Power Poles - 0 - To be confirmed by Electric Company | n/c |
| 615054 | [ 1] Flood Zone - 10AE | n/c |
| 615058 | [ 1] Minumum Finish Floor Elevation - TBD | n/c |
| 615082 | [ 1] HOA - Yes | n/c |
| 615088 | [ 1] All Permits, Impact Fees, Utility Connection Fees, and Surveys as stated in the contract Included | n/c |

***Entire House***

| | | |
|---|---|---|
| 64002 | [ 1] Fully-Insured Home Buyer Warranty with 10 Year Structural Warranty that begins at Certificate of OccupancyFully-Insured Home Buyer Warranty with 10 Year Structural Warranty that begins at Certificate of Occupancy | n/c |
| 64004 | [ 1] Mono Slab is Included - Minimum # of Stem Wall Courses is based on Municipal Requirements and the height of the property as determined by a Licensed Surveyer and Engineered Site Plan | n/c |
| 612088 | [ 1] OSB Sub Roofing | n/c |

***Exterior***

| | | |
|---|---|---|
| 30010 | [ 1] Elevation 1 | n/c |
| 40010 | [ 1] Exterior Paint Colors - Level 1 - 1 Body Color for Wall, Garage Doors, Service Doors, and Exterior Ceilings 1 Trim Color 1 Front Door Color | n/c |
| 63098 | [ 1] Plate Height - Level 2 - 9'-4" | n/c |
| 305030 | [ 1] Hose Bibs - 1 at Front and 1 at Rear | n/c |
| 406026 | [ 1] Shingle - Level 1 - Dimensional Shingles with Self-Stick Underlayment | n/c |
| 600002 | [ 1] Impact Windows - Whole House White Low-E Aluminum Impact | 11,900.00 |

FRONTLINE CONSTRUCTION PARTNERS

| | | |
|---|---|---|
| 600050 | [ 1] Bathroom Windows Glass - Level 1 - Clear Glass | n/c |
| 600074 | [ 1] Windows - Level 2 - White Low-E Vinyl Impact | n/c |
| 600094 | [ 1] Window Height - Level 2 - 8'-0" | n/c |
| 602002 | [ 1] Exterior Front Door - Double 3/0x8/0 - Level 1 - Fiberglass 6 Panel | n/c |
| 602150 | [ 1] Exterior Front Door Hardware - Level 1 - Kwikset Dakota Handle and Deadbolt | n/c |
| 602218 | [ 1] Sliding Glass Doors - Level 2 - PGT White Low-E Aluminum Impact | n/c |
| 602238 | [ 1] Sliding Glass Doors Height - Level 2 - 8'-0" | n/c |
| 602250 | [ 1] Disappearing Corner with Sliding Glass Door Pocket in Great Room and Stacked in Dining Room | n/c |
| 602254 | [ 1] Stacked Sliding Glass Door in Master Bedroom | n/c |
| 606030 | [ 1] Double Garage Door - Level 1 - Wayne Dalton Steel Model 9100 (7'-0" High) | n/c |
| 606070 | [ 1] Double Garage Door Opener - Level 1 - Two Remotes | n/c |
| 610010 | [ 1] Sod - Level 1 - Bahia | n/c |
| 610034 | [ 1] Plant Material - Level 1 | n/c |
| 612003 | [ 1] Driveway - Level 1 - Concrete 20'-0" wide up to 1,000 sq. ft. | n/c |
| 612019 | [ 1] Walkway - Level 1 - Concrete 4'-0" wide up to 150 sq. ft. | n/c |
| 612074 | [ 1] Textured Stucco Style Finish with Raised Bands on Front Elevation | n/c |
| 612082 | [ 1] Soffit and Fascia - Level 1 - White Aluminum Soffit with 18" Overhang and Aluminum Fascia with 6" Height | n/c |
| 612098 | [ 1] Termite Control - Level 1 - Termite Treatment - Borate | n/c |
| 612106 | [ 1] Gutters Not Included | n/c |
| 612110 | [ 1] Entry - Level 1 - Concrete Flooring | n/c |
| 612114 | [ 1] Lanai - Level 1 - Concrete Flooring | n/c |
| 615002 | [ 1] Mailbox - Black Post Mounted Mailbox | n/c |
| 615004 | [ 1] House Address Numbers | n/c |

***Kitchen***

| | | |
|---|---|---|
| 62096 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Kitchen | n/c |
| 203012 | [ 1] Matching 4" Granite Backsplash | n/c |
| 220102 | [ 1] Cabinets - Level 1 - Kitchen - Merillat McDurmon 36" Shaker Style | n/c |
| 220114 | [ 1] Cabinets - Level 1 - Kitchen Island - Merillat McDurmon 36" Shaker Style | n/c |
| 222102 | [ 1] Cabinet Hardware - Level 1 - Kitchen - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251102 | [ 1] Granite - Level 1 - Kitchen Countertop | n/c |
| 251134 | [ 1] Granite - Level 1 - Island Countertop | n/c |
| 300002 | [ 1] Kitchen Sink - Level 1 - 60/40 Stainless Undermount | n/c |
| 300202 | [ 1] Appliance Package - Level 1 - Samsung SS 27.4 cu ft Side-by-Side Refrigerator with Ice Maker, 30" SS Electric Range Oven with Smooth Ceramic Glass Cooktop, SS Dishwasher with Top Control, and SS 1.9 cu ft 1000 watt Microwave with Recirculating Vent Hood | n/c |
| 302010 | [ 1] Garbage Disposal 1/2 HP | n/c |
| 302012 | [ 1] Kitchen Faucet - Level 1 - Moen Arbor | n/c |
| 302024 | [ 1] Ice Maker Water Line | n/c |

**FRONTLINE CONSTRUCTION PARTNERS**

***Master Bedroom***

| | | |
|---|---|---|
| 62104 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat with 8" 90 Degree Tray - Master Bedroom | n/c |
| 200126 | [ 1] Carpet - Luxury Level 1 - Master Bedroom | n/c |

***Bedroom 2***

| | | |
|---|---|---|
| 200131 | [ 1] Carpet - Luxury Level 1 - Bedroom 2 | n/c |

***Bedroom 3***

| | | |
|---|---|---|
| 200136 | [ 1] Carpet - Luxury Level 1 - Bedroom 3 | n/c |

***Master Bathroom***

| | | |
|---|---|---|
| 202114 | [ 1] Tile - Floor - Level 1 - Master Bath - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 203022 | [ 1] Shower Wall Tile & Floor - Level 1 - Master Bathroom | n/c |
| 220118 | [ 1] Cabinets - Level 1 - Master Bath - Merillat McDurmon Shaker Style Comfort Height Vanity | n/c |
| 222114 | [ 1] Cabinet Hardware - Level 1 - Master Bath - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251114 | [ 1] Granite - Level 1 - Master Bath Countertop | n/c |
| 300032 | [ 1] Double Vanity Sink - Level 1 - Master Bathroom - Porcelain White Oval Undermount | n/c |
| 303002 | [ 1] Vanity Faucet - Level 1 - Master Bathroom - Moen Voss 4" Centerset | n/c |
| 303014 | [ 1] Shower Faucet & Systems - Level 1 - Master Bathroom - Moen Voss Series | n/c |
| 303026 | [ 1] Bathroom Accessories - Level 1 - Master Bathroom - Includes Toilet Paper Holder, Towel Bar, and Towel Ring | n/c |
| 303038 | [ 1] Toilet - Level 1 - Master Bathroom - Comfort Height Elongated with Soft-Close Seat | n/c |
| 480002 | [ 1] Shower Glass - Level 1 - Master Bathroom - 42" High Wall with Glass Above | n/c |

***Bath 2***

| | | |
|---|---|---|
| 202118 | [ 1] Tile - Floor - Level 1 - Bath 2 - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 203042 | [ 1] Shower Wall Tile & Floor - Level 1 - Bathroom 2 | n/c |
| 220122 | [ 1] Cabinets - Level 1 - Bath 2 - Merillat McDurmon Shaker Style Comfort Height Vanity | n/c |
| 222118 | [ 1] Cabinet Hardware - Level 1 - Bath 2 - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251118 | [ 1] Granite - Level 1 - Bath 2 Countertop | n/c |
| 300042 | [ 1] Vanity Sink - Level 1 - Bathroom 2 - Porcelain White Oval Undermount | n/c |
| 303048 | [ 1] Vanity Faucet - Level 1 - Bathroom 2 - Moen Voss 4" Centerset | n/c |
| 303060 | [ 1] Shower Faucet & Systems - Level 1 - Bathroom 2 - Moen Voss Series | n/c |
| 303072 | [ 1] Bathroom Accessories - Level 1 - Bathroom 2 - Includes Toilet Paper Holder, Towel Bar, and Towel Ring | n/c |
| 303084 | [ 1] Toilet - Level 1 - Bathroom 2 - Comfort Height Elongated with Soft-Close Seat | n/c |
| 480012 | [ 1] Shower Glass - Level 1 - Bathroom 2 - 7'-0" Glass Bypass Door, not included with Tub | n/c |

***Dining Room***

FRONTLINE
CONSTRUCTION PARTNERS

| | | |
|---|---|---|
| 62092 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Dining Room | n/c |

***Foyer***

| | | |
|---|---|---|
| 62108 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Foyer | n/c |

***Den/Study***

| | | |
|---|---|---|
| 200121 | [ 1] Carpet - Luxury Level 1 - Den/Study | n/c |

***Great Room***

| | | |
|---|---|---|
| 62088 | [ 1] Ceilings - Level 1 - Height 9'-4"" Flat with 12" 90 Degree Tray - Great Room | n/c |

***Garage***

| | | |
|---|---|---|
| 306002 | [ 1] Water Heater - 50 Gallon Electric | n/c |
| 410068 | [ 1] Garage Interior Texture and Paint Matches Interior Wall Color | n/c |

***Laundry Room***

| | | |
|---|---|---|
| 304002 | [ 1] Faucet - Level 1 - Laundry Room | n/c |
| 306006 | [ 1] Wall Mount Utility Sink | n/c |

***Custom***

| | | |
|---|---|---|
| 900002 | [ 1] Custom Option 1 Extra Fill & Stem Wall | 5,000.00 |
| 900004 | [ 1] Custom Option 2 4 Course Foundation | 12,500.00 |

***Interior***

| | | |
|---|---|---|
| 62084 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat in Remainder of Home | n/c |
| 202186 | [ 1] Tile - Floor - Level 1 - Main Living Areas - Includes Great Room, Kitchen, Dining Room, Foyer, Hallways, Laundry, and Craft Room on Anna Maria - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 221442 | [ 1] Medicine Cabinets Not Included | n/c |
| 401008 | [ 1] Prewire-Ceiling Fan w/ 2 Switches - Bedrooms, Great Room, Den/Study, and Lanai | n/c |
| 401042 | [ 1] Switch - Rocker | n/c |
| 401126 | [ 1] Outlet - Phone - 1 at Master Bedroom and 1 at Kitchen | n/c |
| 401130 | [ 1] Outlet - Cable - Bedrooms, Great Room, and Den/Study | n/c |
| 401138 | [ 1] Outlet - Weatherproof(15 AMP/GFI) - 1 at Front and 1 at Rear | n/c |
| 404002 | [ 1] Lighting Luxury Package - Fixtures in Foyer and Bathroom Vanities | n/c |
| 408026 | [ 1] R-30 Batt or Blown Cellulose Living Area Ceiling | n/c |
| 408030 | [ 1] Fi-Foil R-4.1 Masonry Exterior Walls | n/c |
| 408034 | [ 1] R-13 Fiberglass Batt Frame Exterior Walls and Wall Between Garage and House | n/c |
| 410002 | [ 1] Drywall Texture - Level 1 - Skip Trowel Walls and Knockdown Ceilings | n/c |
| 410046 | [ 1] Drywall - Level 1 - Durarock Shower Walls and Exterior Ceiling Board on Lanai Ceiling | n/c |
| 410064 | [ 1] Square Drywall Corners | n/c |
| 410066 | [ 1] Solid Surface Window Sills | n/c |

**FRONTLINE CONSTRUCTION PARTNERS**

| | | |
|---|---|---|
| 412002 | [ 1] Interior Paint - Level 1 -<br>Sherwin Williams (LVR > 60)<br>1 Wall Color / 1 Trim Color at Doors, Base, Door Casing, and Window Sills / White Ceilings | n/c |
| 412022 | [ 1] Interior Paint Sheen - Level 1 -<br>Flat Walls at All Interior Rooms / Semi Gloss Trim at Doors, Base, Door Casing and Window Sills / Flat at Ceilings | n/c |
| 414006 | [ 1] Shelving - Level 1 -<br>Vinyl Covered Wire Shelving at BR Closets and above Washer & Dryer<br>Vinyl Covered Wire Shelving with 5 Shelves at Pantry and Linen | n/c |
| 420002 | [ 1] Baseboard - Level 1 -<br>5-1/4" Style L5180 | n/c |
| 420026 | [ 1] Door Casing - Level 1 -<br>3-1/2" Style H444 | n/c |
| 460006 | [ 1] Mirrors above Vanities | n/c |
| 604010 | [ 1] Interior Door Style - Level 1 - Jeld-Wen Commore 6 Panel Hollow Core | n/c |
| 604038 | [ 1] Interior Door Hardware - Level 1 -<br>Kwikset Balboa Lever | n/c |
| 604070 | [ 1] Interior Door Height<br>Great Room Doors 8'-0" and Remaining Doors 6'-8" | n/c |

***System***

| | | |
|---|---|---|
| 400038 | [ 1] HVAC System - Level 2 -<br>Straight Cool 16 Seer A/C System | n/c |
| 400042 | [ 1] Non-Vented Range Hood | n/c |
| 400046 | [ 1] Bathroom Exahust Fans | n/c |

***Discounts***

| | | |
|---|---|---|
| 900016 | [ -1] Sales Price Discount | -27,290.00 |

| | | |
|---|---|---|
| **TOTAL OPTIONS:** | | **$ 2,110.00** |
| **TOTAL SALES PRICE:** | | **$ 341,010.00** |

OWNER(S):

Claudio Bevilacqua
Claudio Bevilacqua (Dec 18, 2021 12:14 GMT-3)

**BEVILACQUA CLAUDIO ALEJANDRO** — Dec 18, 2021 **Date**

**Date**

FRONTLINE CONSTRUCTION PARTNERS, LLC.

Don Boggus (Dec 20, 2021 12:32 EST)

**Seller Contractor License #CRC58398** — Dec 20, 2021 **Date**

**A46 BEVILACQUA CLAUDIO ALEJANDRO 1RS008** **Owner** CB
CRC058398 **Owner**

FRONTLINE CONSTRUCTION PARTNERS

Alicia Jenks

Dec 20, 2021

**Alicia Jenks** **Date**

N/A = Non-Applicable / TBD = To Be Determined with or without Additional Costs. Contractor reserves the right to substitute of equal or better quaility or style. All discounts have been incorporated within the contract total. No additional discounts or incentives will be honored. Natural materials and finishes may vary in color and pattern.

# MANASOTA

## 1,815 sq. ft.|3 Bedrooms|2 Bathrooms|2.5 Car Garage




A/C 1,815 sq. ft.
Garage 542 sq. ft.
Lanai 234 sq. ft.
Entry 75 sq. ft.

Total 2,666 sq. ft.

CB
CB

FRONTLINE
CONSTRUCTION PARTNERS

941.702.6067
MODEL HOME LOCATED AT
8127 Dimstead Street Port Charlotte, FL 33981
www.FrontLineBuild.com

Strength & Security... YOU CAN BUILD ON

Plans, pricing, and availability are subject to change without notice. Elevation shown is subject to change. Square footages are approximate and may vary. Due to supply, Frontline Construction Partners LLC reserves the right to substitute of equal or better quality. Frontline Construction Partners LLC reserves the right to change floor plan specifications and prices without notice. This document is for marketing purposes only. License #CRC058398. Revised 7.26.21

**FRONTLINE CONSTRUCTION PARTNERS**

## Cash/Draw Payment Schedule

OWNER(s): **BEVILACQUA CLAUDIO ALEJANDRO**

JOB ADDRESS: **24 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179012** JOB #: **1RS008**

**TOTAL CONTRACT PRICE: 341,010.00**

| Cash/Draw % | Cash/Draw Payment Due at | Amount Due |
|---|---|---|
| 15% | Contract Deposit | $51,151.50 |
| | 60-Days after Contract Date - Payment is due for all Loan Costs, Prepaid Interest, Closing Costs & Loan Origination Fees | TBD |
| | **TOTAL PAYMENT DUE** | TBD |

Any amounts due to the Contractor are due within 5 business days of request. In the event any amounts due to the Contractor remain unpaid for more than ten (10) days after the due date thereof, then, and in such event, such amounts shall bear interests thereafter at the rate of 1.5% per month until payment in full has been made and the Total Contract Price may be subject to an increase from increased costs and Owner shall be in default under the contract.

OWNER(S):

Claudio Bevilacqua
Claudio Bevilacqua (Dec 18, 2021 12:14 GMT-3)

**BEVILACQUA CLAUDIO ALEJANDRO** Dec 18, 2021 **Date**

**Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC.**

Don Boggus (Dec 20, 2021 12:32 EST)

**Seller/Contractor License #CRC58398** Dec 20, 2021 **Date**

Alicia Jenks

**Alicia Jenks** Dec 20, 2021 **Date**

FRONTLINE CONSTRUCTION PARTNERS

# MOLD NOTICE, DISCLOSURE and DISCLAIMER

**What Homeowners Should Know about Mold**

Mold is a type of fungus. It occurs naturally in the environment, and it is necessary for the natural decomposition of plant and other organic material. It spreads by means of microscopic spores borne on the wind, and is found everywhere life can be supported. If the growing conditions are right, mold can grow in your home. Most homeowners are familiar with mold growth in some form or another. Examples of mold are bread mold, and mold that may grow on bathroom tile.

In order to grow, mold requires a food source. This may be supplied by items found in the home, such as fabric, carpet or even wallpaper, or by building materials, such as drywall, wood and insulation, to name a few. Mold also requires a temperate climate. The best growth has been determined to occur between 40 and 100 degrees F. Finally, mold growth requires moisture which is the only mold growth factor that can be controlled in a residential setting. A homeowner can minimize or reduce mold growth by minimizing moisture.

Common sources of home moisture include spills, leaks, overflows, condensation, and high humidity. As Florida is prone to extremely high humidity, good housekeeping and home maintenance practices are essential to prevent and eliminate mold growth. If moisture is allowed to remain, mold can develop within 24 to 48 hours.
Consequences of mold. Although not all mold is harmful, certain strains have been shown to have adverse health effects in susceptible persons. The most common effects are allergic reactions, including skin irritation, watery eyes, running nose, coughing, sneezing, congestion, sore throat and headache. Individuals with suppressed immune systems may risk infections. Some experts disagree about the level of mold exposure that may cause health problems, and about the exact nature and extent of the health problems that may be caused by mold. The Center for Disease Control states that a casual link between the presence of toxic mold and serious health conditions has not been proven.

**Consequences of mold.**

Although not all mold is harmful, certain strains have been shown to have adverse health effects in susceptible persons. The most common effects are allergic reactions, including skin irritation, watery eyes, running nose, coughing,
sneezing, congestion, sore throat and headache. Individuals with suppressed immune systems may risk infections. Some experts disagree about the level of mold exposure that may cause health problems, and about the exact nature and extent of the health problems that may be caused by mold. The Center for Disease Control states that a casual link between the presence of toxic mold and serious health conditions has not been proven.

**A46 BEVILACQUA CLAUDIO ALEJANDRO**
**1RS008**
CRC058398

**Owner** CB

**Owner**

October 29, 2021

FRONTLINE CONSTRUCTION PARTNERS

**What Homeowners can do.**

The homeowner can take positive steps to reduce or eliminate the occurrence of mold growth in the home, and thereby minimize any possible adverse effects that may be caused by mold. These steps include the following:

1. Before bringing items in to the home, check for signs of mold. Potted plants (roots and soil), furnishings or stored clothing and bedding material, as well as many other household goods, could already contain mold and growth.
2. Regular vacuuming and cleaning will help reduce mold levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold growth.
3. Keep the humidity in the home low. Vent clothes dryers to the outdoors. Ventilate kitchen and bathrooms by opening the windows, by using exhaust fans, or by running the air conditioner to remove excess moisture in the air, and to facilitate evaporation of water from the wet surface.
4. Promptly clean up spills, condensation and other sources of moisture. Thoroughly dry any wet surfaces or material. Do not let water pool or stand in your home. Promptly replace any materials that cannot be thoroughly dried, such as drywall or insulation.
5. Inspect for leaks on a regular basis. Look for discoloration or wet spots. Repair any leaks promptly. Inspect condensation pans (refrigerators and air conditioners) for mold growth. Take notice of musty odors, and any visible signs of mold.
6. Should mold develop, thoroughly clean the affected area with a mild solution of bleach. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery or carpet should be discarded. Should the mold growth be severe, call on the services of a qualified professional cleaner.
7. Electronic air filters that may assist in effective air filtration and dehumidifiers to maintain humidity levels are available at additional cost from numerous vendors.

**Disclaimer and Waiver**

Whether or not you as a homeowner experience mold growth depends largely on how you manage and maintain your home. Everyhome contains products, materials and industrial chemicals that are used in constructing the home which may cause allergic or other bodily reactions in some individuals. You should consult your physician to determine the chemicals that may adversely affect you or members of your family. Our responsibility as a Contractor must be limited to things that we can control. As explained in our written warranty, provided by this instrument, we will repair or replace defects in your construction (defects defined as a failure to comply with reasonable standards of residential construction) for a period of one (1) year. The Contractor will not be responsible for any damages caused by mold or by some other agent not associated with defects in our construction, to include, but not limited to, property damage, personal injury, loss of income, emotional distress, death, loss of use, loss of value, and adverse health effects, or any other effects. Any implied warranties, including an implied warranty of workmanlike construction, an implied warranty of habitability, or an implied warranty of fitness for a particular use, are hereby waived and disclaimed.

**A46 BEVILACQUA CLAUDIO ALEJANDRO**
**1RS008**
CRC058398

Owner CB

Owner

October 29, 2021

# FRONTLINE CONSTRUCTION PARTNERS

THE OWNER UNDERSTANDS AND AGREES THAT THE CONTRACTOR IS NOT RESPONSIBLE, AND HEREBY DISCLAIMS ANY LIABILITY FOR, ANY DAMAGES, ILLNESS OR ALLERGIC REACTIONS WHICH THE OWNER, THE OWNER'S FAMILY MEMBERS OR THE OWNER'S INVITEES MAY EXPERIENCE AS A RESULT OF MOLD, MILDEW, FUNGUS, SPORES OR CHEMICALS, TO INCLUDE, PERSONAL INJURY, EMOTIONAL DISTRESS, DEATH, ADVERSE HEALTH EFFECTS LOSS OF USE, LOSS OF VALUE, LOSS OF INCOME, PROPERTY DAMAGE, AND CONSEQUENTIAL DAMAGES OR ANY OTHER EFFECTS.

**There are no warranties which extend beyond the description on the face hereof.**

This Notice, Disclaimer and Waiver Agreement is hereby made a part of the Construction Contract between Owner and the Contractor. The consideration for this agreement shall be the same consideration as stated in the Construction Contract. Should any term or provision of this agreement be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this agreement shall nonetheless stand in full force and effect. I (we) acknowledge receipt of this Notice, Disclaimer and Waiver agreement. I (we) have carefully read and reviewed its terms, understand same and agree to its provisions.

Owner(s):

Claudio Bevilacqua (Dec 18, 2021 12:14 GMT-3)

**BEVILACQUA CLAUDIO ALEJANDRO** — Dec 18, 2021 **Date**

**Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC.**

Don Boggus (Dec 20, 2021 12:32 EST)

**Seller/Contractor License #CRC58398** — Dec 20, 2021 **Date**

**Alicia Jenks** — Dec 20, 2021 **Date**

**NATIONAL**
New Home Warranty Program

2-10 HOME BUYERS WARRANTY®

# QUALITY BUILT by Your Builder.
# BACKED by the Industry-Leading Warranty.

Workmanship | Distribution Systems | Structural

CB

**FRONTLINE CONSTRUCTION PARTNERS**

# Addendum

BUYER: **BEVILACQUA CLAUDIO ALEJANDRO**

JOB ADDRESS: **24 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179012** JOB #: **1RS008**

**Seller and Buyer have agreed upon the following terms and conditions as part of the contract:**

## ADDENDUM 1 TO CONSTRUCTION CONTRACT

THIS ADDENDUM is annexed to and forms a part of that certain Construction Contract dated the 18th day of November, 2021, by and between FRONTLINE CONSTRUCTION PARTNERS LLC., a Florida limited liability company (hereinafter referred to as "Contractor") and Claudio A. Bevilacqua, a Florida limited liability company (hereinafter referred to as "Owner").
1.Conflict with Contract. In the event of any conflict between the terms and provisions of this Addendum and the terms and provisions of the Construction Contract to which this Addendum is annexed, the terms and provisions of this Addendum shall take precedence and control. The aforesaid Construction Contract, as supplemented and amended by this Addendum, is hereinafter sometimes collectively referred to as the "Agreement". Unless otherwise indicated in this Addendum, defined or capitalized terms used herein shall have the meanings, respectively, ascribed to them in the aforementioned Construction Contract.

2.Deposit. Anything in Section 3 of the Contract to the contrary notwithstanding, it is expressly understood and agreed that Contractor shall not disburse the Deposit, in whole or in part, until Contractor shall provide to Owner the initial invoice to be paid with the proceeds of the Deposit.

3.Building Permits. Anything contained in Section 5 of the Contract to the contrary notwithstanding, in the event Contractor is unable to obtain all necessary licenses, approvals and permits necessary to do the Work within one hundred and twenty (120) days from the date of this Contract, the Contractor shall have the option to terminate this Contract by written notice and return all monies paid to Contractor by Owner. Owner shall be entitled to a full refund of the Deposit without setoff or deduction of any kind.

4.Draws. Anything in Section 7 of the Contract to the contrary notwithstanding, with each request for draw (other than the final draw) during the progress of the Work, Contractor shall deliver to Owner partial lien waivers or releases from each subcontractor, supplier, or other entity who has have given a Notice to Owner as provided in Section 713.06, Florida Statutes, for all work performed through the date of the immediately preceding draw request. Prior to payment of Contractor's final draw, Owner shall have performed a final inspection of the Work and furnished to Contractor the "punch list" as provided in Section 11 of the Contract. Additionally, Contractor shall submit to the Owner: (I ) the Contractor's final releases of lien, and final releases of lien from all subcontractors, suppliers or other entities that have given a Notice to Owner; (ii) a Final or Temporary Certificate of Occupancy; and (iii) proof that all permits have been closed.

5. Commencement Date; Substantial Completion. Anything contained in Section 9 of the Contract to the contrary notwithstanding, Contractor shall commence the Work no later than fifteen (15) days following the date of issuance of all building permits and the Work shall be substantially completed within 52 weeks thereafter, except that the substantial completion date may be extended by the number of days that the Work is delayed due to force majeure or other events beyond the reasonable control of Contractor, which delays shall have been documented by written notice to Owner during the progress of the Work. For purposes of this Agreement, the term "substantial completion" shall mean the date when the Project is substantially complete in accordance with the Contract Documents and the Contractor obtains a certificate of occupancy for the Project from the applicable governmental authority.

CB

6. Occupancy. Section 12 of the Contract is hereby deleted.

7. Financing. Section 8 of the Contract is hereby deleted.

8. Contractor Financing. Contractor is to provide financing for Contract's Work. Contractor's financing must be a minimum of 80% of Total Contract Price including a reasonable draw schedule. In the event Contractor is unable to obtain the required financing Contractor shall have the option to terminate this Contract by written notice and return all monies paid to Contractor by Owner. Owner shall be entitled to a full refund of the Deposit without setoff or deduction of any kind.

9. Contractor Financing Costs. Owner is responsible for all costs associated with the Contractor's Work financing. Costs associated with the financing are, but not limited to the following: a. Owner shall have sole responsibility to pay loan origination points of two and a quarter percent (2.25%) of the loan amount.
b. Owner shall have sole responsibility for closing costs.
c. Owner shall have sole responsibility for loan fees.
d. Owner shall have sole responsibility for 6 months of prepaid interest on the loan amount as well as interest payments from month 7 through completion. Interest rate is 9 nine and a half percent rate (9.5%).
e. Owner shall have sole responsibility for loan extension cost of one percent of loan amount if necessary to extend loan beyond 12 months.

10. Property Deed. Owner is responsible for deeding the Property to Contractor within 30 days of the Contract date. Owner is to use a Quit Claim Deed legally executed with all information necessary to record in the public records of the Property's County.

11. Closing. At Property's Substantial Completion the final transaction between Contractor and Owner is the Closing where Owner remits payment according to the Contract, title to the Property passes to the Owner and the Contract is deemed to be complete. ("Closing")

Owner acknowledges and agrees that Contractor has the right in its sole discretion to schedule the date, time and place of the Closing. (the "Closing Date") Contractor is authorized to postpone or advance the date of Closing at its discretion. Contractor must, however, give Owner reasonable notice of the new Closing Date. Any notice of Closing may be given verbally, by telephone, mail, or e-mail. If Owner fails, for any reason, to close at the date, time and place specified by Contractor, Contractor shall have the option to declare Owner in default. Contractor shall convey title to Owner at Closing by delivery to Owner of a Quit Claim Deed. Owner is responsible to pay all costs, prorations and fees payable at Closing.

12. Counterparts. This Agreement may be executed in one or more counterparts and shall become effective only when one or more counterparts have been signed by all the parties. Each counterpart shall be deemed an original, but all of the counterparts together shall constitute only one single agreement.

13. Assignability. This Agreement may not be assigned by either Party, without the other Party's written consent, as long as the assignment is assigned to a legal entity, and as long as the assignment takes place no later than December 30, 2021.

CB
CB

OWNER(S):

Claudio Bevilacqua
Claudio Bevilacqua (Dec 18, 2021 12:14 GMT-3)

Dec 18, 2021

**BEVILACQUA CLAUDIO ALEJANDRO** **Date**

**Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC.**

Don Boggus (Dec 20, 2021 12:32 EST)

Dec 20, 2021

**Seller/Contractor License #CRC58398** **Date**

Alicia Jenks

Dec 20, 2021

**Alicia Jenks** **Date**

**A46 BEVILACQUA CLAUDIO ALEJANDRO**
**1RS008**
CRC058398

**Owner** CB
CB

**Owner**

# JOB #1RS008 - CONTRACT

Final Audit Report 2021-12-20

| | |
|---|---|
| Created: | 2021-11-18 |
| By: | Alicia Jenks (ajenks@frontlinecapitalpartners.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAT2w1bXla5ViLDp9pxfOexB2vnkb-y-P9 |

## "JOB #1RS008 - CONTRACT" History

Document created by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
2021-11-18 - 6:33:34 PM GMT- IP address: 47.200.118.26

Document emailed to Claudio Bevilacqua (inmoibiza@hotmail.com) for signature
2021-11-18 - 6:40:00 PM GMT

Email viewed by Claudio Bevilacqua (inmoibiza@hotmail.com)
2021-11-18 - 6:45:19 PM GMT- IP address: 190.132.110.69

Email viewed by Claudio Bevilacqua (inmoibiza@hotmail.com)
2021-12-18 - 3:08:24 PM GMT- IP address: 152.156.213.206

Document e-signed by Claudio Bevilacqua (inmoibiza@hotmail.com)
Signature Date: 2021-12-18 - 3:14:56 PM GMT - Time Source: server- IP address: 152.156.213.206

Document emailed to Don Boggus (dboggus@frontlinecapitalpartners.com) for signature
2021-12-18 - 3:14:59 PM GMT

Email viewed by Don Boggus (dboggus@frontlinecapitalpartners.com)
2021-12-20 - 5:31:28 PM GMT- IP address: 174.248.56.113

Document e-signed by Don Boggus (dboggus@frontlinecapitalpartners.com)
Signature Date: 2021-12-20 - 5:32:11 PM GMT - Time Source: server- IP address: 174.248.56.113

Document emailed to Alicia Jenks (ajenks@frontlinecapitalpartners.com) for signature
2021-12-20 - 5:32:14 PM GMT

Email viewed by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
2021-12-20 - 6:04:05 PM GMT- IP address: 47.200.118.26

Document e-signed by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
Signature Date: 2021-12-20 - 6:04:24 PM GMT - Time Source: server- IP address: 47.200.118.26

Agreement completed.

2021-12-20 - 6:04:24 PM GMT

# Exhibit B

FRONTLINE
CONSTRUCTION PARTNERS

**CONSTRUCTION CONTRACT**
**(For Use Where Construction is on Owner's Property)**

**JOB #: 1RS007**

THIS CONSTRUCTION CONTRACT, made and executed on this date **October 29, 2021**, by and between:

**BEVILACQUA CLAUDIO ALEJANDRO,**

(hereinafter referred to as "Owner"), whose mailing address is:

**690 Lincoln Rd # 300, Miami Beach, FL 33139,**

and Frontline Construction Partners, LLC (hereinafter referred to as "Contractor"), whose mailing address is 1267 2nd St. Sarasota, FL 34236 and whose Certified Residential Contractor License is CRC058398, which parties for good and valuable consideration each to the other, the receipt and sufficiency of which is conclusively acknowledged, do hereby agree as follows:

1. **DESCRIPTION OF PROPERTY AND WORK TO BE PERFORMED.** Contractor agrees to construct improvements on Owner's real property located at: **22 COXSWAINE CIRCLE, PLACIDA, FL 33946**, in accordance with this Contract and the additional contract documents attached hereto, as indicated in paragraph 28 hereof.

The Parcel ID Number of the Subject Property is **412131179013**

**ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001 – 713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID-IN-FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.**

**2. CONTRACT PRICE.** Owner agrees to pay Contractor the following Contract Price, together with adjustments, if any, for Change Orders as described in paragraph 10, and for any material costs increases as described in paragraph 30, if applicable, and for Allowances and Exclusions as described in Exhibit B, if applicable, in accordance with the further provisions of this Contract. Total Contract Price is subject to increases in costs if commencement of construction is delayed by any act or omission of the owner for more than ninety 90 days from date of this agreement.

| | |
|---|---|
| **Contract Price** | **$ 338,900.00** |
| Subject Property Lot | **$ 0.00** |
| Additions to Contract Price (per Job Summary) | **$ 2,110.00** |
| **Total Contract Price** | **$ 341,010.00** |

**3. DEPOSIT**. Upon the execution of this Contract, Owner shall pay Contractor a deposit as outlined below:

| | | | | |
|---|---|---|---|---|
| Deposits | | | | |
| | Initial Deposit due at Signing | October 29, 2021 | $ 51,151.50 | |
| If applicable, | Additional deposit due on or before | | $ 0.00 | |
| Total Deposits | | | $ 51,151.50 | |
| Balance Due | | | | $ 289,858.50 |

<u>N/A</u> Owner requires construction loan financing - When Owner requires construction loan financing, the deposit is refundable, less contractor's costs, in the event Owner fails to obtain construction loan financing in the minimum amount of the balance to close provided that the Owner makes complete loan application within five (5) business days of the date of this agreement, actively pursues same in good faith, and obtains a binding loan commitment within thirty (30) days of the date of this agreement, which commitment requires a loan closing thereof within thirty (30) days thereafter. Loan closing is required within 60 days from the date of this agreement. In order for the Owner to receive a deposit refund, less Contractor's costs, the Owner must be unable to obtain a binding loan commitment within the time frames and the Contractor must receive a written notice from the lender within the 30 day deadline, stating that the Owner cannot obtain financing for the minimum amount. If the Owner cancels the Contract for any reason subsequent to these time frames your entire deposit is non-refundable, notwithstanding any other provision.

<u>X</u> Owner does not require financing - When Owner does not require construction loan financing, the deposit is non-refundable.

**4. DEFINITIONS.** The term "cost" means all costs and amounts paid or incurred to third persons by Contractor or by Owner for labor, services, materials, licenses and permits directly related to this Contract. This term shall also include the gross payments to all employees of Contractor for work performed by such employees pursuant to or in preparation of this Contract or in preparation of the plans and specifications referred to herein, (including the income taxes and F.I.C.A. taxes withheld thereon). The term "days" means calendar days, including weekends and holidays, unless otherwise noted; "business days" means weekdays Monday through Friday, which are not legal state holidays. "Commencement of construction" is defined as meaning the date on which footings are poured or, in the case of monolithic footings and slab, the day rough plumbing has begun. "Substantial completion" occurs when the Certificate of Occupancy has been issued or has been delayed solely by act or omission of the owner; or, when the owner occupies the Subject Property. "Consequential damages" consists of costs or expenses which may arise from the special circumstances of either party hereto, including, but not limited to, such things as increases in living expenses, additional storage or interests costs, adverse or aggravated medical conditions or longer travel times and distances, which may be incurred or suffered as a result of, or arising from, a delay in any performance hereunder by either party. "Date of this agreement" and "contract execution date" is defined as the executed date located within the first paragraph of the Contract.

**5. LICENSES AND PERMITS.** Contractor and Owner agree that each party shall obtain and pay for the following licenses, permits or related items as indicated, if required. Unless otherwise indicated, the responsibility for obtaining any license or permit includes the responsibility for obtaining all governmental licenses or permits, if required. In the event that Contractor is unable to obtain all necessary licenses, approvals and permits required to do the work within 120 days from the date of this Contract, then Contractor shall have the option of terminating this Contract and returning all monies paid to Contractor by Owner, less Contractor's costs. If the initial deposit paid by the Owner as stated in paragraphs 3 and 6 of this Contract is more than 10% of the total Contract Price as stated in paragraph 2 of this Contract, then the Owner is entitled pursuant to Florida Statute Section 489.126(2) to have Contractor apply for all permits, necessary to do the work to be performed (as detailed in paragraph 1 of this Contract) within 30 days after the date initial deposit is made and to commence work within 90 days after the date all necessary permits for work are issued, unless the Owner agrees in writing to a longer period as to either time frame or both. Owner hereby agrees to allow Contractor 120 days to apply for all necessary permits, if the Owner's initial deposit is greater than 10 percent. Such amounts are to be paid and the license or permit obtained as and when Contractor needs such licenses or permits to complete the work described in this Contract by the following:

| DESCRIPTION OF LICENSE OR PERMIT | | CONTRACTOR | OWNER |
|---|---|---|---|
| a) | Home Owner's Association Approval (if applicable) | X | |
| b) | Building Permit | X | |
| c) | Survey | X | |
| d) | Sewer Systems/Septic Permit (if applicable) | X | |
| e) | Flood Elevation Certificate (if applicable) | X | |
| f) | Other () | | |
| g) | Other () | | |

**6. TIME OF PAYMENT; INTEREST DUE.** Owner agrees to pay Contractor the Contract Price specified in paragraph 2, in accordance with:

<u>N/A</u> **Lender's Required Draw Schedule**
Lender:
Owner agrees that the construction loan financing obtained by the Owner does not require the Owner (borrower) to request, release, and/or authorize any construction loan draw disbursement to the Contractor. Owner agrees that the construction loan financing obtained by the Owner does not require the use of checks made payable jointly to the Owner (borrower) and Contractor. This applies to all construction loan draw disbursements prior to the final construction loan draw disbursement.

<u>X</u> **Cash/Draw Payment Schedule**

Any amounts due to the Contractor are due within 3 business days of request. In the event any amounts due to the Contractor remain unpaid for more than ten (10) days after the due date thereof, then, and in such event, such amounts shall bear interests thereafter at the rate of 1.5% per month until payment in full has been made and the Total Contract Price may be subject to an increase from increased costs and Owner shall be in default under the contract.

**7. DRAW REQUESTS.** At such times as Contractor completes each of the items set forth in the draw schedule Contractor shall submit a written draw request by letter or email to Owner or to Owner's Lender, as applicable, for an amount equal to the percentage of the Contract Price applicable to each item of construction then completed, less the percentage previously requested and paid for each such items. All draw requests are due and payable within 3 days of request. If requested by Owner or Owner's Lender, Contractor will provide Owner or Owner's Lender with a partial lien release, dated no more than 45 days prior to the draw request, or a final lien release from each entity that has served a Notice to Owner.

**8. FINANCING.** It shall be the responsibility of the Owner to pay the construction loan interest. It shall be the sole responsibility of Owner to obtain any financing necessary to create and maintain a draw account deposit sufficient to make all the payments set forth in this Contract, and Owner shall have sole responsibility to pay all fees, charges or other costs of such financing, including inspection fees charged by any such lender. The nonperformance of any such lender shall not affect the obligation of Owner to Contractor; provided, however, the draw schedule designated by the construction loan lender shall supersede and replace the draw schedule set forth herein. In the event any portion of the Contract Price is to be paid from the proceeds of a construction loan, Owner agrees to provide Contractor with written verification of a construction loan commitment, subject only to standard conditions, as a condition precedent to Contractor beginning any work. The Contractor is not obligated to begin work until such time as: (A) a Notice of Commencement has been recorded; and, (B) the Owner has obtained a construction loan, which, when added to Owners funds paid to Contractor or on deposit for payment to Contractor, is in the amount of not less than the Contract Price, the terms of which will permit the Contractor to submit draw requests directly to the lender or owner in accordance with the draw schedule in paragraph 6 of this Contract or the draw schedule in the loan documents. In addition, Contractor may cease construction work at such times, and from time to time, if the balance in the draw account is ever less than the balance of the Contract Price then due for completion, plus any increased costs for all change orders.

**9. TIMES AND MANNER OF PERFORMANCE BY CONTRACTOR.** Contractor shall make a reasonable effort to commence work within thirty (30) days of the issuance of all building permits and verification from Owner in writing that all funds necessary for payment of the Contract Price are available, whichever shall last occur. Contractor shall diligently pursue and substantially complete all work to be performed under this Contract within a reasonable period of time, taking into consideration delays that are beyond the control of the Contractor, including, but not limited to, weather conditions, delays in selection or delivery of materials, change orders requested by Owner and delays in obtaining all necessary licenses or permits or the certificate of occupancy. Owner is not to rely on any oral representations from the Contractor or its subcontractors with regard to when substantial completion will occur. Contractor shall not be liable to Owner for any losses, costs or damages resulting from or arising out of a delay or inability to perform this Contract as described herein or caused by any event beyond the control of the contractor.

**10. CHANGE ORDERS.** Owner may request changes to the plans, specifications or selection of finished material subject to Contractor's approval. **Changes that require, per government regulations, amending the plans and specifications in order to obtain a building permit may only be requested within 21 days from this agreement**. Changes that do not require, per government regulations, amending the plans and specifications in order to obtain a building permit may only be requested by Owner and approved by Contractor will be subject to a Three Hundred and No/100 Dollars ($300.00) non-refundable, cash processing fee after the 3rd Change Order has been executed. Owner shall pay to Contractor any increase in Contract Price prior to the work being performed, or as set forth in the Change Order. Any increase to the Contract Price, additional costs, or Allowance overages, Contractor shall be entitled to recover from Owner the amount stated therein plus a minimum of 18%. To the extent that additional work is performed, or materials delivered at the Owner's request which is not the subject of a signed Change Order, the Contractor shall be entitled to recover from Owner the amount stated therein, or, if no amount is stated, the costs thereof, plus 18%.

**11. FINAL INSPECTION/PUNCH LIST.** Within five (5) days of notification by Contractor that all work is substantially complete, Owner shall conduct a final inspection of the improvements and prepare a punch list, which, if agreeable, shall be signed and dated by both parties. Contractor shall be responsible for completion of all items on the punch list; provided, however, even if there are punch list items yet to be completed, the Contractor shall be entitled to receive all remaining amounts due under this Contract. The final inspection and completion of the punch list shall constitute the Owner's unconditional acceptance of the property as built without regard to the variations or differences between the property and the model home and/or drawings, renderings, or plans viewed as examples by the Owner.

**12. OCCUPANCY.** Owner hereby grants to Contractor an exclusive leasehold on the real property described herein, effective upon execution of this agreement and continuing until substantial completion of construction, and payment in full to the Contractor. Owner shall not occupy the structure or move any personal property onto the property until the Contract Price, including any increases as the result of change orders, are paid in full to the Contractor. In the event Owner occupies the property prior to making final payment to the Contractor, then Owner shall be deemed to have APPROVED AND ACCEPTED all labor, services and materials, as well as Contractor's performance hereunder as being complete. In addition, any such occupancy by the Owner or authorized by the Owner, shall result in the Owner being obligated to pay rent to the Contractor at the rate of one percent (1%) of the Contract Price for each month or portion thereof that any such occupancy continues until the Contract Price, as adjusted by any change orders, has been paid in full to the Contractor.

**13. USE OF CONTRACTOR'S EMPLOYEES, AGENTS, SUBCONTRACTORS, OR MATERIAL SUPPLIERS.** Owner and Owner's family members or agents shall not in any manner, utilize, unreasonably interfere communicate, or contract with Contractor's employees, subcontractors, subcontractor's employees or agents, or material suppliers, nor perform or permit any work on the Subject Property, without the prior written approval of the Contractor, which approval may be withheld in the Contractor's unrestricted discretion; provided, however, that if such consent is given, then Owner shall be solely responsible for the payment, shipment, delivery, insurance installation, and damages for delay arising therefrom.

**14. WARRANTIES BY CONTRACTOR. CONTRACTOR MAKES NO EXPRESS OR IMPLIED WARRANTIES, EXCEPT AS STATED HEREIN. ALL STATED WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED.**

(a) Owner acknowledges the opportunity, either at the time of the execution of this document, at the time of contract with Contractor, and/or during the construction of the home, to review the terms and conditions of the Home Buyers Warranty Corporation (2-10 HBW) 2-10 Warranty Document(s) available to me through the Contractor or 2-10 HBW. If, for any reason, Owner has not received or have not had an opportunity to review a copy of the Warranty Document(s), Owner must obtain a copy of it by requesting the Warranty Document in writing from 2-10 HBW. Mail request to Home Buyers Warranty Corporation; Warranty Administration Office; 10375 East Harvard Ave, Denver, CO 80231. Should Owner choose not to obtain a copy of same from 2-10 HBW or choose not to review the Warranty Document(s) at the times listed above, Owner hereby waives the right to later assert any inapplicability of the terms and conditions of the Warranty Document(s).

Owner understands that if and when the new home warranty is issued, it is an Express Limited Warranty, not an insurance policy and any and all claims, whether contractual or otherwise, are controlled by the express terms, conditions and exclusions contained in the Warranty Document. Certain items and events are not covered by this warranty. Refer to the section title "Exclusions" in the Warranty Document.

Owner is responsible for signing and returning to Contractor the new home warranty application within 15 days of the Certificate of Occupancy. Owner acknowledges that the new home warranty cannot be issued without the signed and returned application. Once the new home warranty application has been received by Contractor, within the allotted time, Owner acknowledges that the new home warranty goes into effect the date the Certificate of Occupancy is issued.

Any other warranty or warranties, whether express or implied, are disclaimed by Contractor and waived by Owner, unless otherwise prohibited by particular state law.

(b) Owner acknowledges that minor changes may occur in the drafting process, which may result in the loss or gain of square footage in the Residence. Owner shall not be entitled to any credits against or reductions in the contract price as a result of such changes.

(c) MOLD IS A NATURALLY OCCURRING GROWTH THAT MAY HAVE ADVERSE HEALTH CONSEQUENCES AND WHICH REQUIRES CERTAIN PREVENTATIVE AND PROPER MAINTENANCE ACTIONS BY THE OWNER. ACCORDINGLY, CONTRACTOR ASSUMES NO LIABILITY WHATSOEVER FROM ANY HARM TO INDIVIDUALS AND DAMAGES TO PROPERTY ARISING AS A RESULT OF MOLD UNRELATED TO CONSTRUCTION DEFECTS.

(d) Contractor disclaims, and Owner waives, all warranties expressed or implied concerning all plant material including trees, shrubs, and sod either on the home site or on nearby property. This includes any native plant material or any plant material planted by the Contractor.

**15. TITLE TO PROPERTY, SURVEY, PLACEMENT OF STRUCTURE AND BUILDING SITE.** Owner warrants and represents to Contractor that Owner has fee simple marketable title to the subject property, free and clear of all liens or encumbrances. Owner agrees to tender to Contractor a Certificate of Title clearly showing Owner as the record titleholder of the real property within 5 days of this Agreement. Owner further warrants that Owner has legal right of access to the Subject Property and all rights of title, including easements necessary for the construction, use and occupancy of the structure. It shall be the sole responsibility of Owner to mark the boundaries of the Subject Property and the location on such property where the structure is to be constructed. Any loss or damage suffered by Contractor or any third party as the result of a defect in title or incorrect designation of the boundaries or location of the structure shall be borne solely by Owner. In the event any governmental regulations or private restrictions or covenants, or the results of any soil or subsurface tests requires modifications to the structure or to the subsurface, the cost of such modifications shall be added to the Contract Price and are payable in the same manner as if originally included in the Contract Price, or, at contractor's option, due and payable at the time the costs of such modifications are incurred. Owner shall provide a clear, accessible building site, correctly zoned and otherwise allowable for the improvements to be made.

**16. PLANS AND SPECIFICATIONS.** The Contractor has provided the plans and specifications, and any loss, cost, damage or expense incurred by the other party as the result of any defects in such plans and specifications shall be borne by the party providing the plans and specifications. In the event of a conflict between the plans and specifications, the specifications shall control. In the event of a conflict between the plans, specifications and contract documents, the contract documents shall control. Notwithstanding the foregoing, the plans and specifications for the residence are subject to any changes necessitated by building code revisions or other governmental regulations. The content and concept contained within Contractor's documents and design plans belong to and remain the Intellectual Property of Contractor. Documents or designs may not be dispersed, shared or used by any other person(s) or entity without the written consent of Contractor.

**17. INSURANCE.** Contractor shall, at Contractor's expense, maintain all insurance required by law, including general liability, but not flood insurance, in connection with the work to be performed under this Contract. In addition, Contractor shall, at Contractor's expense, during the period of construction and until issuance of a certificate of occupancy or until the Contractor's earlier termination of work, maintain a builders risk insurance policy for property damage, theft and vandalism equal to the Contract Price, but not including land, or other improvements, including but not limited to, pool, docks, walls or fencing. Contractor shall provide for such coverage at Contractor's expense. Any insurance payment to the Owner for work performed by the Contractor shall be paid to the Contractor. Contractor is not responsible for providing flood insurance.

**18. RIGHT-TO-CURE.** FLORIDA LAW (CHAPTER 558, FLORIDA STATUTES) CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTORS, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

**19. DEFAULT / NOTICE OF DEFAULT.** Other than for claims of defective construction, which are governed solely by the "right-to- cure" laws disclosed in paragraph 20, Contractor shall be in default under this Contract if Contractor abandons work on the structure or otherwise refuse to carry out his obligations under this Contract (unless such abandonment or refusal is based upon a prior default by Owner which Owner has failed to cure after written notice thereof). Contractor shall be deemed to have abandoned work if Contractor shall fail to perform or cause any work to be performed on the Subject Property for sixty (60) consecutive days, unless such failure is the result of any event beyond the control of the Contractor. Owner shall be in default under this Contract if Owner refuses to permit Contractor to complete performance, fail to pay any amounts when due, or otherwise refuses to carry out the obligations of Owner under this Contract (unless such refusal or nonpayment is based upon a prior default by Contractor which Contractor has failed to cure after written notice thereof). In the event of default, the defaulting party shall be entitled to receive written notice, by certified mail return receipt requested or by hand delivery to the address shown below, which specifies the event(s) of default. The defaulting party shall have ten (10) days from the receipt of the notice in which to begin the curing of any default, which actions shall be continuously pursued and completed within a reasonable time in of light the nature of the default; provided, however, the cure of any default in payment must be completed within ten (10) days from the date of notice of default. If any default is timely cured, each party agrees that this Contract shall remain in full force and effect and neither party may assert any claims as the result of such default. All notices shall be to the respective addresses of the parties as follows, or as otherwise set forth in written notice to the other party:

(a) As to CONTRACTOR:
Frontline Construction Partners, LLC
1267 2nd St
Sarasota, FL 34236

(b) As to OWNER:
**Claudio A. Bevilacqua**
**690 Lincoln Rd # 300**
**Miami Beach, FL 33139**

**20. REMEDIES AFTER DEFAULT:**

(a) BY CONTRACTOR. Except for claims by the Owner of defective construction, which are governed solely by the "right-to-cure" law disclosed in paragraph 20, in the event of default by Contractor which is not cured within the time specified, the Owner may, at Owner's option, declare the Contract terminated and seek damages only for the reasonable and necessary costs to complete construction in accordance with the original plans and specifications and for the Contract Price (adjusted by Change Orders to the date of termination), less any balance of the adjusted Contract Price not paid to Contractor, and excluding any other damages whatsoever, such as: damages for delay, or for any consequential damages.

(b) BY OWNER. In the event of default by Owner which is not cured within the time specified, the Contractor, at Contractor's option, shall: (1) provide a notice of default, upon which contractor shall be entitled to all costs incurred by Contractor together with profits in the amount of fifteen (15%) percent of the total contract price , and excluding any other damages whatsoever, such as: damages for delay, or for any consequential damage; or (2) may complete the construction and seek damages for breach of contract. The parties have agreed to this liquidated damage provision due to the difficulties and uncertainties associated with the calculation of actual damages for lost profits which Contractor is likely to incur as the result of a default by Owner.

**21. VENUE AND JURISDICTION.** Except for claims by the Owner of defective construction, which are governed solely by the "right-to- cure" law disclosed in paragraph 20, the parties agree that any and all claims, disputes and controversies between the Owner and Contractor arising from or related to the subject home identified herein, or to any defect in or to the subject home or the real property on which the subject home is situated, or the sale of the subject home by seller, including but not limited to, any claim for breach of contract, negligent or intentional misrepresentation, shall be submitted to a Florida court of competent jurisdiction in the county where the work was to be performed as described in paragraph 1.

The aforementioned also applies to any and all claims, disputes and controversies between the Owner and Contractor prior to Substantial Completion..

**22. ATTORNEY FEES.** In the event of any disputes arising out of or in connection with this contract, the prevailing party therein shall be entitled to recover reasonable attorney fees and costs, whether same were incurred prior to or during any judicial proceedings, including, but not limited to, any trial or appellate proceedings, as well as prior to or during any of the alternative dispute resolution mechanisms, whether described in paragraphs 20 and 23 or otherwise ordered by a court of competent jurisdiction.

**23. GOVERNING LAW, ASSIGNMENT AND RECORDING.** This Contract shall be construed and enforced in accordance with the laws of the State of Florida and may not be assigned or recorded except with the prior approval of both parties, which approval may be withheld for any reason whatsoever.

**24. INTEGRATION CLAUSE.** This Contract and the additional contract documents attached hereto, as indicated in paragraph 28 hereof, constitute the complete agreement between the parties and may not be modified except in writing signed by all parties hereto. ORAL REPRESENTATIONS BY EITHER PARTY ARE NOT BINDING AND SHOULD NOT BE RELIED UPON.

**25. CONSTRUCTION INDUSTRIES RECOVERY FUND.** PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:

Construction Industry Licensing Board
1940 N. Monroe Street
Tallahassee, Florida, 32399-0784.
850-487-2252

**26. ADDITIONAL CONTRACT DOCUMENTS.** If marked, the following additional documents are a part hereof and each party acknowledges receipt of a copy thereof:

X Job Summary

X Cash/Draw Payment Schedule Addendum

X Mold Notice, Disclosure, and Disclaimer

**27. CONTROLLING PROVISIONS AND HEADINGS.** All handwritten or typewritten provisions herein shall control over any printed provisions in conflict therewith, unless otherwise provided. The headings on each paragraph are for

the sole convenience of the parties and shall not be construed to be a part of this Contract.

**28. INCREASES IN MATERIALS COSTS.** In the event that, during construction of the improvement described herein, Contractor's costs for materials used or to be used herein are increased by more than 2% over the Contractor's costs for same at the time this agreement was signed, for any cause(s) and this includes any increase in costs that are a result of construction delays, then, and in such event(s), Contractor shall have the right to pass the entire amount of materials costs increase(s) along to owner by adding the total amount(s) thereof to the Contract Price.

**29. SPECIAL CLAUSES** (If "none," leave blank):

**30. INSULATION DISCLOSURE.** In accordance with 16 C.F.R., Chapter 1, Section 460.16, the following disclosure is made regarding the insulation, which has been or will be installed in the improvements described herein, as follows (if known):

| Location | Type | Thickness | Manufacturer's R-Value |
|---|---|---|---|
| Exterior Walls | Fi-Foil | N/A | R=4.1 |
| Interior Walls | None | | |
| Flat Ceiling | Fiberglass | 9.5" | R=30 |
| Sloped Ceiling | Fiberglass | 11.5" | R=30 |
| Framed Wall 2nd Floor | Fiberglass | 3.5" | R=11 |
| Framed Wall @ Garage | Fiberglass | 3.5" | R=11 |

**Note:** If any of the above information is incomplete, it is either because this information has already been included in the plans or specifications identified herein, or because this information is unknown at the time this agreement was entered into. However, if any of the above information is incomplete and has not been included in the plans or specifications identified herein, then it will be furnished to the Buyer when the information becomes available. Buyer hereby acknowledges that this R-value information is based solely upon information supplied by the manufacturer or installer and that Contractor does not represent or warrant the accuracy of this information. Buyer further acknowledges that the actual R-values may vary based upon normal construction variances in insulation thickness and openings in walls.

**31. WAVIER OF STATUTORY RIGHT TO ESCROW.** PURSUANT TO SECTION 501.1375, FLORIDA STATUTES, IF CONTRACTOR BUILDS MORE THAN TEN (10) RESIDENTIAL UNITS PER YEAR, THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER. BY SIGNING THIS AGREEMENT, OWNER DOES HEREBY WAIVE THIS STATUTORY RIGHT.

**32. INDEMNIFICATION.** In consideration of the first One Hundred and No/100 Dollars ($100.00) to be paid hereunder and to the fullest extent permitted by law, Owner agrees to indemnify, hold harmless, and defend Contractor and its agents, servants, and employees, from and against any and all claims, costs, expenses, or liability (including attorneys' fees), attributable to bodily injury, sickness, disease, or death, or to damage to, or destruction of property (including loss of use thereof) caused by, arising out of, resulting from, or occurring in connection with the performance of the work by Owner, Owner's other contractors, their agents, servants, or employees. Owner's obligation hereunder shall only be limited to the extent of the monetary limitations set forth herein and shall not be limited by the provision of any workers compensation or similar act. In addition, should any third party assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the work performed by Owner or its separate contractors or Owner's payment for said work, Owner shall indemnify, hold harmless, and defend Contractors, its agents, servants, and employees from and against any and all liability (including attorneys' fees), loss, damage, or expense arising out of or related to such claim, suit, action or proceeding. Owner's monetary obligation under this indemnification provision is specifically limited to the sum of the contract price. The parties hereby agree that the foregoing monetary limitation bears a reasonable commercial relationship to the contract and Project and constitutes a material part of the specifications for this Project. This indemnity clause is intended to comply with Florida laws on indemnity and, specifically, to comply with Florida Statute §725.06 and is to be interpreted in such a way as to be enforceable.

**33. INDEMNIFY SITE CONDITIONS.** Contractor shall not be responsible for any conditions found on Owner's lot, which were not caused by Contractor, including, but not limited to, any environmental conditions or contamination found thereon. Owner, in consideration of One and No/100 Dollars ($1.00) received from Contractor, hereby agrees to indemnify and hold Contractor harmless from any loss or claim arising out of any hazardous waste or other environmental conditions or contamination found on Owner's lot. Likewise, Contractor shall not be responsible for the water quality found at the single-family residence and releases Contractor from any and all claims relating thereto.

**34. CLOSING COSTS.** In addition to the Total Contract Price, Owner agrees to pay Closing Costs, including but not limited to, appraisal fees, credit reports, lender inspection fees, doc prep fees, recording fees, and city and county and state taxes and stamps on the mortgage and deed, loan origination and/or discount points.

**35. REAL ESTATE TAXES.** Taxes for the year closing will be prorated through the date of closing based on prior year assessment. Owner and Contractor agree that such a pro-ration is a sufficient estimation of taxes for the year of closing and no further proration will be made.

**36. CONSTRUCTION LOAN CLOSING.** Owner agrees that they will close on this transaction at the offices designated by the Contractor on the date and at the time set by the Contractor. Time is of the essence of this Agreement. If Owner is not ready, willing, or able, for any reason whatsoever, to close this transaction within 30 days of loan commitment or on the date set by the Contractor, whichever is later, this Agreement may be terminated or at Contractor's option, extended for a period of up to Thirty (30) days and the Total Contract Price is subject to increases in costs. If the Agreement is terminated based on the Owners' failure to close, the Contractor shall retain the Deposit as its liquidated damages and neither party shall have any further responsibilities under this Agreement.

37. **RIGHT TO ADAPT SITE CONDITIONS.** The shape of the home site and contours and elevations of the land may require Contractor to adapt the foundation, porch, patio, walkway, driveway, and garage of the new home to provide reasonable access and adequate drainage. Contractor has the right to grade, excavate or fill, or to remove native trees, shrubs, and ground cover during construction process.

38. **MATERIAL SUBSTITUTION.** Owner agrees that the Contractor in its sole discretion may substitute materials, product, specifications and/or fixtures for equal or better value or subject to change without notice. Changes may be necessary, required, authorized or approved by governmental authorities having jurisdiction.

39. **SELECTION OF DECORATING ITEMS.** Owner may select certain decorating items from among Contractor provided samples. **Owner agrees to complete selections <u>within 30 days of the date of this agreement.</u>** If the Owner fails to complete, the selection within the timeframe, at no fault of the Contractor, the Contractor will have the right to select the decorating items.

40. **PROPERTY ACCESS.** Owner shall not enter the property without the expressed written consent of Contractor. If Owner, their dependents, guests, companions, or invitees sustain any personal injury or property damage while on property, with or without Contractor's consent, Owner shall indemnify, defend and hold harmless the Contractor from any claim, loss, damage or expense arising from such personal injury or property damage, and purchasers, for themselves and heirs, hereby waive and relinquish any and all subrogation of any rights they might have arising from personal injury or property damage.

41. **RADON.** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of Radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding Radon and Radon testing may be obtained from the local county public health unit. Contractor makes no warranties and representations regarding whether or not Radon exists on the real property upon which the single-family residence is being constructed and is hereby released from any and all liability, which might arise from the presence of Radon.

42. **NOTICE OF RIGHT OF RESCISSION.** You have a legal right under Federal law to cancel this transaction, if you desire to do so, without any penalty or obligation within three business days from the above date or any later date on which all material disclosures required under the Truth in Lending Act have been given to you. If you so cancel the transaction, any lien, mortgage, or other security interest on your home arising from this transaction is automatically void. You are also entitled to receive a refund of any down payment or other consideration if you cancel. If you decide to cancel this transaction, you may do so by notifying the Contractor in writing at the above address.

43. **REAL ESTATE REPRESENTATION.** Contractor's sales representatives, or employees do not represent Owner in any capacity. Owner represents and warrants to Contractor that this transaction was not brought about by any real estate professional other than the Realtor and Realtor's Broker identified below. Owner shall indemnify and hold Contractor harmless from any liability or damage, including attorney's fees and court costs, in connection with any other claim for brokerage. Broker's commission shall be paid by Contractor.

**BROKER NAME: Zalaquett Group**
**BROKER ADDRESS: 690 Lincoln Rd #300, Miami, FL, 33139**
**REALTOR NAME: William Zalaquett**
**REALTOR EMAIL & PHONE #: william@thezalaquettgroup.com 786-606-7927**

**44. MISCELLANEOUS**

(a) This Agreement may not be assigned,
(b) Whenever the context shall so require, the singular shall include the plural, the masculine gender shall include the female and neuter, and visa-versa.
(c) This Agreement may not be modified except in written execution by both parties.
(d) If two or more persons are identified as Owners in this Agreement, any one of them shall have the right and authority to bind the other(s) in all matters relating to this Agreement.
(e) This Agreement is binding upon the Contractor only when executed by a duly authorized employee of the Contractor.
(f) This Agreement represents the entire Agreement between the parties hereto, and supersedes all prior agreements, which shall henceforth become null and void. There are no collateral agreements or understandings. Oral representations shall not be relied upon.
(g) This is to give you notice that FRONTLINE MORTGAGE PARTNERS, LLC, and MODERN BUILDERS REALTY L.L.C. has a business relationship with FRONTLINE CONSTRUCTION PARTNERS, LLC. Because of this relationship, this referral may provide FRONTLINE CONSTRUCTION PARTNERS, LLC a financial or other benefit.

OWNER(S):

Claudio Bevilacqua

**BEVILACQUA CLAUDIO ALEJANDRO** — Dec 18, 2021 — **Date**

______________________ — **Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC**

[signature]

**Seller/Contractor License # CRC058398** — Dec 20, 2021 — **Date**

Alicia Jenks

**Alicia Jenks** — Dec 20, 2021 — **Date**

# FRONTLINE CONSTRUCTION PARTNERS

## Contract Job Summary Sheet

| BUYER: | BEVILACQUA CLAUDIO ALEJANDRO |
|---|---|

JOB ADDRESS: **22 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179013** JOB #: **1RS007** SALES PERSON: **Alicia Jenks**
MODEL NAME: **Manasota Luxury**

| BASE PRICE OF HOME: | **$ 338,900.00** |
|---|---|

OPTIONS:

***Subdivision-Lot***

| | | |
|---|---|---|
| 109 | Lot Premium: 1RS007 (22 COXSWAINE CIRCLE, PLACIDA, FL 33946) | n/c |

***Subdivision-Lot***

| | | |
|---|---|---|
| 612067 | [ 1] Site Work Allowance - Level 1 - $20,000 | n/c |
| 612070 | [ 1] Culvert Allowance - $750 | n/c |
| 615006 | [ 1] Builder's Risk | n/c |
| 615008 | [ 1] Flood Insurance Not Included (if required) | n/c |
| 615012 | [ 1] Utilities Water - Public with 25'-0" Service Included | n/c |
| 615020 | [ 1] Utilities Sewer - Public with 25'-0" Service Included | n/c |
| 615028 | [ 1] Garage Left or Right Based on Electric Company's Closest Power Source with 25'-0" Service IncludedGarage Left or Right Based on Electric Company's Closest Power Source with 25'-0" Service Included | n/c |
| 615040 | [ 1] Additional Power Poles - 0 - To be confirmed by Electric Company | n/c |
| 615054 | [ 1] Flood Zone - 10AE | n/c |
| 615058 | [ 1] Minumum Finish Floor Elevation - TBD | n/c |
| 615082 | [ 1] HOA - Yes | n/c |
| 615088 | [ 1] All Permits, Impact Fees, Utility Connection Fees, and Surveys as stated in the contract Included | n/c |

***Entire House***

| | | |
|---|---|---|
| 64002 | [ 1] Fully-Insured Home Buyer Warranty with 10 Year Structural Warranty that begins at Certificate of OccupancyFully-Insured Home Buyer Warranty with 10 Year Structural Warranty that begins at Certificate of Occupancy | n/c |
| 64004 | [ 1] Mono Slab is Included - Minimum # of Stem Wall Courses is based on Municipal Requirements and the height of the property as determined by a Licensed Surveyer and Engineered Site Plan | n/c |
| 612088 | [ 1] OSB Sub Roofing | n/c |

***Exterior***

| | | |
|---|---|---|
| 30010 | [ 1] Elevation 1 | n/c |
| 40010 | [ 1] Exterior Paint Colors - Level 1 - 1 Body Color for Wall, Garage Doors, Service Doors, and Exterior Ceilings; 1 Trim Color; 1 Front Door Color | n/c |
| 63098 | [ 1] Plate Height - Level 2 - 9'-4" | n/c |
| 305030 | [ 1] Hose Bibs - 1 at Front and 1 at Rear | n/c |
| 406026 | [ 1] Shingle - Level 1 - Dimensional Shingles with Self-Stick Underlayment | n/c |
| 600002 | [ 1] Impact Windows - Whole House White Low-E Aluminum Impact | 11,900.00 |

CB

**FRONTLINE CONSTRUCTION PARTNERS**

| | | |
|---|---|---|
| 600050 | [ 1] Bathroom Windows Glass - Level 1 - Clear Glass | n/c |
| 600074 | [ 1] Windows - Level 2 - White Low-E Vinyl Impact | n/c |
| 600094 | [ 1] Window Height - Level 2 - 8'-0" | n/c |
| 602002 | [ 1] Exterior Front Door - Double 3/0x8/0 - Level 1 - Fiberglass 6 Panel | n/c |
| 602150 | [ 1] Exterior Front Door Hardware - Level 1 - Kwikset Dakota Handle and Deadbolt | n/c |
| 602218 | [ 1] Sliding Glass Doors - Level 2 - PGT White Low-E Aluminum Impact | n/c |
| 602238 | [ 1] Sliding Glass Doors Height - Level 2 - 8'-0" | n/c |
| 602250 | [ 1] Disappearing Corner with Sliding Glass Door Pocket in Great Room and Stacked in Dining Room | n/c |
| 602254 | [ 1] Stacked Sliding Glass Door in Master Bedroom | n/c |
| 606030 | [ 1] Double Garage Door - Level 1 - Wayne Dalton Steel Model 9100 (7'-0" High) | n/c |
| 606070 | [ 1] Double Garage Door Opener - Level 1 - Two Remotes | n/c |
| 610010 | [ 1] Sod - Level 1 - Bahia | n/c |
| 610034 | [ 1] Plant Material - Level 1 | n/c |
| 612003 | [ 1] Driveway - Level 1 - Concrete 20'-0" wide up to 1,000 sq. ft. | n/c |
| 612019 | [ 1] Walkway - Level 1 - Concrete 4'-0" wide up to 150 sq. ft. | n/c |
| 612074 | [ 1] Textured Stucco Style Finish with Raised Bands on Front Elevation | n/c |
| 612082 | [ 1] Soffit and Fascia - Level 1 - White Aluminum Soffit with 18" Overhang and Aluminum Fascia with 6" Height | n/c |
| 612098 | [ 1] Termite Control - Level 1 - Termite Treatment - Borate | n/c |
| 612106 | [ 1] Gutters Not Included | n/c |
| 612110 | [ 1] Entry - Level 1 - Concrete Flooring | n/c |
| 612114 | [ 1] Lanai - Level 1 - Concrete Flooring | n/c |
| 615002 | [ 1] Mailbox - Black Post Mounted Mailbox | n/c |
| 615004 | [ 1] House Address Numbers | n/c |

***Kitchen***

| | | |
|---|---|---|
| 62096 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Kitchen | n/c |
| 203012 | [ 1] Matching 4" Granite Backsplash | n/c |
| 220102 | [ 1] Cabinets - Level 1 - Kitchen - Merillat McDurmon 36" Shaker Style | n/c |
| 220114 | [ 1] Cabinets - Level 1 - Kitchen Island - Merillat McDurmon 36" Shaker Style | n/c |
| 222102 | [ 1] Cabinet Hardware - Level 1 - Kitchen - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251102 | [ 1] Granite - Level 1 - Kitchen Countertop | n/c |
| 251134 | [ 1] Granite - Level 1 - Island Countertop | n/c |
| 300002 | [ 1] Kitchen Sink - Level 1 - 60/40 Stainless Undermount | n/c |
| 300202 | [ 1] Appliance Package - Level 1 - Samsung SS 27.4 cu ft Side-by-Side Refrigerator with Ice Maker, 30" SS Electric Range Oven with Smooth Ceramic Glass Cooktop, SS Dishwasher with Top Control, and SS 1.9 cu ft 1000 watt Microwave with Recirculating Vent Hood | n/c |
| 302010 | [ 1] Garbage Disposal 1/2 HP | n/c |
| 302012 | [ 1] Kitchen Faucet - Level 1 - Moen Arbor | n/c |
| 302024 | [ 1] Ice Maker Water Line | n/c |

**FRONTLINE CONSTRUCTION PARTNERS**

***Master Bedroom***

| | | |
|---|---|---|
| 62104 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat with 8" 90 Degree Tray - Master Bedroom | n/c |
| 200126 | [ 1] Carpet - Luxury Level 1 - Master Bedroom | n/c |

***Bedroom 2***

| | | |
|---|---|---|
| 200131 | [ 1] Carpet - Luxury Level 1 - Bedroom 2 | n/c |

***Bedroom 3***

| | | |
|---|---|---|
| 200136 | [ 1] Carpet - Luxury Level 1 - Bedroom 3 | n/c |

***Master Bathroom***

| | | |
|---|---|---|
| 202114 | [ 1] Tile - Floor - Level 1 - Master Bath - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 203022 | [ 1] Shower Wall Tile & Floor - Level 1 - Master Bathroom | n/c |
| 220118 | [ 1] Cabinets - Level 1 - Master Bath - Merillat McDurmon Shaker Style Comfort Height Vanity | n/c |
| 222114 | [ 1] Cabinet Hardware - Level 1 - Master Bath - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251114 | [ 1] Granite - Level 1 - Master Bath Countertop | n/c |
| 300032 | [ 1] Double Vanity Sink - Level 1 - Master Bathroom - Porcelain White Oval Undermount | n/c |
| 303002 | [ 1] Vanity Faucet - Level 1 - Master Bathroom - Moen Voss 4" Centerset | n/c |
| 303014 | [ 1] Shower Faucet & Systems - Level 1 - Master Bathroom - Moen Voss Series | n/c |
| 303026 | [ 1] Bathroom Accessories - Level 1 - Master Bathroom - Includes Toilet Paper Holder, Towel Bar, and Towel Ring | n/c |
| 303038 | [ 1] Toilet - Level 1 - Master Bathroom - Comfort Height Elongated with Soft-Close Seat | n/c |
| 480002 | [ 1] Shower Glass - Level 1 - Master Bathroom - 42" High Wall with Glass Above | n/c |

***Bath 2***

| | | |
|---|---|---|
| 202118 | [ 1] Tile - Floor - Level 1 - Bath 2 - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 203042 | [ 1] Shower Wall Tile & Floor - Level 1 - Bathroom 2 | n/c |
| 220122 | [ 1] Cabinets - Level 1 - Bath 2 - Merillat McDurmon Shaker Style Comfort Height Vanity | n/c |
| 222118 | [ 1] Cabinet Hardware - Level 1 - Bath 2 - Satin Nickel Door Knob and Drawer Pull | n/c |
| 251118 | [ 1] Granite - Level 1 - Bath 2 Countertop | n/c |
| 300042 | [ 1] Vanity Sink - Level 1 - Bathroom 2 - Porcelain White Oval Undermount | n/c |
| 303048 | [ 1] Vanity Faucet - Level 1 - Bathroom 2 - Moen Voss 4" Centerset | n/c |
| 303060 | [ 1] Shower Faucet & Systems - Level 1 - Bathroom 2 - Moen Voss Series | n/c |
| 303072 | [ 1] Bathroom Accessories - Level 1 - Bathroom 2 - Includes Toilet Paper Holder, Towel Bar, and Towel Ring | n/c |
| 303084 | [ 1] Toilet - Level 1 - Bathroom 2 - Comfort Height Elongated with Soft-Close Seat | n/c |
| 480012 | [ 1] Shower Glass - Level 1 - Bathroom 2 - 7'-0" Glass Bypass Door, not included with Tub | n/c |

***Dining Room***

CB

FRONTLINE CONSTRUCTION PARTNERS

| | | |
|---|---|---|
| 62092 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Dining Room | n/c |
| ***Foyer*** | | |
| 62108 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat - Foyer | n/c |
| ***Den/Study*** | | |
| 200121 | [ 1] Carpet - Luxury Level 1 - Den/Study | n/c |
| ***Great Room*** | | |
| 62088 | [ 1] Ceilings - Level 1 - Height 9'-4"" Flat with 12" 90 Degree Tray - Great Room | n/c |
| ***Garage*** | | |
| 306002 | [ 1] Water Heater - 50 Gallon Electric | n/c |
| 410068 | [ 1] Garage Interior Texture and Paint Matches Interior Wall Color | n/c |
| ***Laundry Room*** | | |
| 304002 | [ 1] Faucet - Level 1 - Laundry Room | n/c |
| 306006 | [ 1] Wall Mount Utility Sink | n/c |
| ***Custom*** | | |
| 900002 | [ 1] Custom Option 1 Extra Fill & Stem Wall | 5,000.00 |
| 900004 | [ 1] Custom Option 2 4 Course Foundation | 12,500.00 |
| ***Interior*** | | |
| 62084 | [ 1] Ceilings - Level 1 - Height 9'-4" Flat in Remainder of Home | n/c |
| 202186 | [ 1] Tile - Floor - Level 1 - Main Living Areas - Includes Great Room, Kitchen, Dining Room, Foyer, Hallways, Laundry, and Craft Room on Anna Maria - 17" x 17" Ceramic Tile with Crack Suppressant | n/c |
| 221442 | [ 1] Medicine Cabinets Not Included | n/c |
| 401008 | [ 1] Prewire-Ceiling Fan w/ 2 Switches - Bedrooms, Great Room, Den/Study, and Lanai | n/c |
| 401042 | [ 1] Switch - Rocker | n/c |
| 401126 | [ 1] Outlet - Phone - 1 at Master Bedroom and 1 at Kitchen | n/c |
| 401130 | [ 1] Outlet - Cable - Bedrooms, Great Room, and Den/Study | n/c |
| 401138 | [ 1] Outlet - Weatherproof(15 AMP/GFI) - 1 at Front and 1 at Rear | n/c |
| 404002 | [ 1] Lighting Luxury Package - Fixtures in Foyer and Bathroom Vanities | n/c |
| 408026 | [ 1] R-30 Batt or Blown Cellulose Living Area Ceiling | n/c |
| 408030 | [ 1] Fi-Foil R-4.1 Masonry Exterior Walls | n/c |
| 408034 | [ 1] R-13 Fiberglass Batt Frame Exterior Walls and Wall Between Garage and House | n/c |
| 410002 | [ 1] Drywall Texture - Level 1 - Skip Trowel Walls and Knockdown Ceilings | n/c |
| 410046 | [ 1] Drywall - Level 1 - Durarock Shower Walls and Exterior Ceiling Board on Lanai Ceiling | n/c |
| 410064 | [ 1] Square Drywall Corners | n/c |
| 410066 | [ 1] Solid Surface Window Sills | n/c |

**FRONTLINE CONSTRUCTION PARTNERS**

| | | |
|---|---|---|
| 412002 | [ 1] Interior Paint - Level 1 -<br>Sherwin Williams (LVR > 60)<br>1 Wall Color / 1 Trim Color at Doors, Base, Door Casing, and Window Sills / White Ceilings | n/c |
| 412022 | [ 1] Interior Paint Sheen - Level 1 -<br>Flat Walls at All Interior Rooms / Semi Gloss Trim at Doors, Base, Door Casing and Window Sills / Flat at Ceilings | n/c |
| 414006 | [ 1] Shelving - Level 1 -<br>Vinyl Covered Wire Shelving at BR Closets and above Washer & Dryer<br>Vinyl Covered Wire Shelving with 5 Shelves at Pantry and Linen | n/c |
| 420002 | [ 1] Baseboard - Level 1 -<br>5-1/4" Style L5180 | n/c |
| 420026 | [ 1] Door Casing - Level 1 -<br>3-1/2" Style H444 | n/c |
| 460006 | [ 1] Mirrors above Vanities | n/c |
| 604010 | [ 1] Interior Door Style - Level 1 - Jeld-Wen Commore 6 Panel Hollow Core | n/c |
| 604038 | [ 1] Interior Door Hardware - Level 1 -<br>Kwikset Balboa Lever | n/c |
| 604070 | [ 1] Interior Door Height<br>Great Room Doors 8'-0" and Remaining Doors 6'-8" | n/c |

***System***

| | | |
|---|---|---|
| 400038 | [ 1] HVAC System - Level 2 -<br>Straight Cool 16 Seer A/C System | n/c |
| 400042 | [ 1] Non-Vented Range Hood | n/c |
| 400046 | [ 1] Bathroom Exahust Fans | n/c |

***Discounts***

| | | |
|---|---|---|
| 900016 | [ -1] Sales Price Discount | -27,290.00 |

| | | |
|---|---|---|
| **TOTAL OPTIONS:** | | **$ 2,110.00** |
| **TOTAL SALES PRICE:** | | **$ 341,010.00** |

OWNER(S):
Claudio Bevilacqua

**BEVILACQUA CLAUDIO ALEJANDRO**

Dec 18, 2021
**Date**

**Date**

FRONTLINE CONSTRUCTION PARTNERS, LLC.

**Seller Contractor License #CRC58398**

**Date**

CB

**A45 BEVILACQUA CLAUDIO ALEJANDRO 1RS007**
CRC058398

**Owner**
**Owner**

FRONTLINE CONSTRUCTION PARTNERS

Alicia Jenks Dec 20, 2021

**Alicia Jenks** **Date**

N/A = Non-Applicable / TBD = To Be Determined with or without Additional Costs. Contractor reserves the right to substitute of equal or better quaility or style. All discounts have been incorporated within the contract total. No additional discounts or incentives will be honored. Natural materials and finishes may vary in color and pattern.

# MANASOTA

## 1,815 sq. ft.|3 Bedrooms|2 Bathrooms|2.5 Car Garage




A/C 1,815 sq. ft.
Garage 542 sq. ft.
Lanai 234 sq. ft.
Entry 75 sq. ft.

Total 2,666 sq. ft.

CB

FRONTLINE CONSTRUCTION PARTNERS

941.702.6067
MODEL HOME LOCATED AT
8127 Dimstead Street Port Charlotte, FL 33981
www.FrontLineBuild.com

YOU CAN BUILD ON

Plans, pricing, and availability are subject to change without notice. Elevation shown is subject to change. Square footages are approximate and may vary. Due to supply, Frontline Construction Partners LLC reserves the right to substitute of equal or better quality. Frontline Construction Partners LLC reserves the right to change floor plan specifications and prices without notice. This document is for marketing purposes only. License #CRC058398. Revised 7.26.21

FRONTLINE
CONSTRUCTION PARTNERS

## Cash/Draw Payment Schedule

OWNER(s): **BEVILACQUA CLAUDIO ALEJANDRO**

JOB ADDRESS: **22 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179013** JOB #: **1RS007**

**TOTAL CONTRACT PRICE: 341,010.00**

| Cash/Draw % | Cash/Draw Payment Due at | Amount Due |
|---|---|---|
| 15% | Contract Deposit | $51,151.50 |
| | 60-Days after Contract Date - Payment is due for all Loan Costs, Prepaid Interest, Closing Costs & Loan Origination Fees | TBD |
| | **TOTAL PAYMENT DUE** | TBD |

Any amounts due to the Contractor are due within 5 business days of request. In the event any amounts due to the Contractor remain unpaid for more than ten (10) days after the due date thereof, then, and in such event, such amounts shall bear interests thereafter at the rate of 1.5% per month until payment in full has been made and the Total Contract Price may be subject to an increase from increased costs and Owner shall be in default under the contract.

OWNER(S):

Claudio Bevilacqua — Dec 18, 2021

**BEVILACQUA CLAUDIO ALEJANDRO** — **Date**

**Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC.**

Dec 20, 2021

**Seller/Contractor License #CRC58398** — **Date**

Alicia Jenks — Dec 20, 2021

**Alicia Jenks** — **Date**

**FRONTLINE CONSTRUCTION PARTNERS**

## MOLD NOTICE, DISCLOSURE and DISCLAIMER

**What Homeowners Should Know about Mold**

Mold is a type of fungus. It occurs naturally in the environment, and it is necessary for the natural decomposition of plant and other organic material. It spreads by means of microscopic spores borne on the wind, and is found everywhere life can be supported. If the growing conditions are right, mold can grow in your home. Most homeowners are familiar with mold growth in some form or another. Examples of mold are bread mold, and mold that may grow on bathroom tile.

In order to grow, mold requires a food source. This may be supplied by items found in the home, such as fabric, carpet or even wallpaper, or by building materials, such as drywall, wood and insulation, to name a few. Mold also requires a temperate climate. The best growth has been determined to occur between 40 and 100 degrees F. Finally, mold growth requires moisture which is the only mold growth factor that can be controlled in a residential setting. A homeowner can minimize or reduce mold growth by minimizing moisture.

Common sources of home moisture include spills, leaks, overflows, condensation, and high humidity. As Florida is prone to extremely high humidity, good housekeeping and home maintenance practices are essential to prevent and eliminate mold growth. If moisture is allowed to remain, mold can develop within 24 to 48 hours.

Consequences of mold. Although not all mold is harmful, certain strains have been shown to have adverse health effects in susceptible persons. The most common effects are allergic reactions, including skin irritation, watery eyes, running nose, coughing, sneezing, congestion, sore throat and headache. Individuals with suppressed immune systems may risk infections. Some experts disagree about the level of mold exposure that may cause health problems, and about the exact nature and extent of the health problems that may be caused by mold. The Center for Disease Control states that a casual link between the presence of toxic mold and serious health conditions has not been proven.

**Consequences of mold.**

Although not all mold is harmful, certain strains have been shown to have adverse health effects in susceptible persons. The most common effects are allergic reactions, including skin irritation, watery eyes, running nose, coughing,
sneezing, congestion, sore throat and headache. Individuals with suppressed immune systems may risk infections. Some experts disagree about the level of mold exposure that may cause health problems, and about the exact nature and extent of the health problems that may be caused by mold. The Center for Disease Control states that a casual link between the presence of toxic mold and serious health conditions has not been proven.

**FRONTLINE CONSTRUCTION PARTNERS**

**What Homeowners can do.**

The homeowner can take positive steps to reduce or eliminate the occurrence of mold growth in the home, and thereby minimize any possible adverse effects that may be caused by mold. These steps include the following:

1. Before bringing items in to the home, check for signs of mold. Potted plants (roots and soil), furnishings or stored clothing and bedding material, as well as many other household goods, could already contain mold and growth.
2. Regular vacuuming and cleaning will help reduce mold levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold growth.
3. Keep the humidity in the home low. Vent clothes dryers to the outdoors. Ventilate kitchen and bathrooms by opening the windows, by using exhaust fans, or by running the air conditioner to remove excess moisture in the air, and to facilitate evaporation of water from the wet surface.
4. Promptly clean up spills, condensation and other sources of moisture. Thoroughly dry any wet surfaces or material. Do not let water pool or stand in your home. Promptly replace any materials that cannot be thoroughly dried, such as drywall or insulation.
5. Inspect for leaks on a regular basis. Look for discoloration or wet spots. Repair any leaks promptly. Inspect condensation pans (refrigerators and air conditioners) for mold growth. Take notice of musty odors, and any visible signs of mold.
6. Should mold develop, thoroughly clean the affected area with a mild solution of bleach. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery or carpet should be discarded. Should the mold growth be severe, call on the services of a qualified professional cleaner.
7. Electronic air filters that may assist in effective air filtration and dehumidifiers to maintain humidity levels are available at additional cost from numerous vendors.

**Disclaimer and Waiver**

Whether or not you as a homeowner experience mold growth depends largely on how you manage and maintain your home. Everyhome contains products, materials and industrial chemicals that are used in constructing the home which may cause allergic or other bodily reactions in some individuals. You should consult your physician to determine the chemicals that may adversely affect you or members of your family. Our responsibility as a Contractor must be limited to things that we can control. As explained in our written warranty, provided by this instrument, we will repair or replace defects in your construction (defects defined as a failure to comply with reasonable standards of residential construction) for a period of one (1) year. The Contractor will not be responsible for any damages caused by mold or by some other agent not associated with defects in our construction, to include, but not limited to, property damage,
personal injury, loss of income, emotional distress, death, loss of use, loss of value, and adverse health effects, or any other effects. Any implied warranties, including an implied warranty of workmanlike construction, an implied warranty of habitability, or an implied warranty of fitness for a particular use, are hereby waived and disclaimed.

**A45 BEVILACQUA CLAUDIO ALEJANDRO** | Owner CB | October 29, 2021
**1RS007**
CRC058398 | Owner

# FRONTLINE CONSTRUCTION PARTNERS

THE OWNER UNDERSTANDS AND AGREES THAT THE CONTRACTOR IS NOT RESPONSIBLE, AND HEREBY DISCLAIMS ANY LIABILITY FOR, ANY DAMAGES, ILLNESS OR ALLERGIC REACTIONS WHICH THE OWNER, THE OWNER'S FAMILY MEMBERS OR THE OWNER'S INVITEES MAY EXPERIENCE AS A RESULT OF MOLD, MILDEW, FUNGUS, SPORES OR CHEMICALS, TO INCLUDE, PERSONAL INJURY, EMOTIONAL DISTRESS, DEATH, ADVERSE HEALTH EFFECTS LOSS OF USE, LOSS OF VALUE, LOSS OF INCOME, PROPERTY DAMAGE, AND CONSEQUENTIAL DAMAGES OR ANY OTHER EFFECTS.

**There are no warranties which extend beyond the description on the face hereof.**

This Notice, Disclaimer and Waiver Agreement is hereby made a part of the Construction Contract between Owner and the Contractor. The consideration for this agreement shall be the same consideration as stated in the Construction Contract. Should any term or provision of this agreement be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this agreement shall nonetheless stand in full force and effect. I (we) acknowledge receipt of this Notice, Disclaimer and Waiver agreement. I (we) have carefully read and reviewed its terms, understand same and agree to its provisions.

Owner(s):

Claudio Bevilacqua — Dec 18, 2021

**BEVILACQUA CLAUDIO ALEJANDRO** — **Date**

**Date**

**FRONTLINE CONSTRUCTION PARTNERS, LLC.**

Dec 20, 2021

**Seller/Contractor License #CRC58398** — **Date**

Alicia Jenks — Dec 20, 2021

**Alicia Jenks** — **Date**

NATIONAL
New Home Warranty Program

2-10 HOME BUYERS WARRANTY.

# QUALITY BUILT by Your Builder.
# BACKED by the Industry-Leading Warranty.

**Workmanship** | **Distribution Systems** | **Structural**

CB

FRONTLINE CONSTRUCTION PARTNERS

# Addendum

BUYER: **BEVILACQUA CLAUDIO ALEJANDRO**

JOB ADDRESS: **22 COXSWAINE CIRCLE, PLACIDA, FL 33946**
PARCEL ID #: **412131179013** JOB #: **1RS007**

**Seller and Buyer have agreed upon the following terms and conditions as part of the contract:**

## ADDENDUM 1 TO CONSTRUCTION CONTRACT

THIS ADDENDUM is annexed to and forms a part of that certain Construction Contract dated the 18th day of November, 2021, by and between FRONTLINE CONSTRUCTION PARTNERS LLC., a Florida limited liability company (hereinafter referred to as "Contractor") and Claudio A. Bevilacqua, a Florida limited liability company (hereinafter referred to as "Owner").

1.Conflict with Contract. In the event of any conflict between the terms and provisions of this Addendum and the terms and provisions of the Construction Contract to which this Addendum is annexed, the terms and provisions of this Addendum shall take precedence and control. The aforesaid Construction Contract, as supplemented and amended by this Addendum, is hereinafter sometimes collectively referred to as the "Agreement". Unless otherwise indicated in this Addendum, defined or capitalized terms used herein shall have the meanings, respectively, ascribed to them in the aforementioned Construction Contract.

2.Deposit. Anything in Section 3 of the Contract to the contrary notwithstanding, it is expressly understood and agreed that Contractor shall not disburse the Deposit, in whole or in part, until Contractor shall provide to Owner the initial invoice to be paid with the proceeds of the Deposit.

3.Building Permits. Anything contained in Section 5 of the Contract to the contrary notwithstanding, in the event Contractor is unable to obtain all necessary licenses, approvals and permits necessary to do the Work within one hundred and twenty (120) days from the date of this Contract, the Contractor shall have the option to terminate this Contract by written notice and return all monies paid to Contractor by Owner. Owner shall be entitled to a full refund of the Deposit without setoff or deduction of any kind.

4.Draws. Anything in Section 7 of the Contract to the contrary notwithstanding, with each request for draw (other than the final draw) during the progress of the Work, Contractor shall deliver to Owner partial lien waivers or releases from each subcontractor, supplier, or other entity who has have given a Notice to Owner as provided in Section 713.06, Florida Statutes, for all work performed through the date of the immediately preceding draw request. Prior to payment of Contractor's final draw, Owner shall have performed a final inspection of the Work and furnished to Contractor the "punch list" as provided in Section 11 of the Contract. Additionally, Contractor shall submit to the Owner: (I ) the Contractor's final releases of lien, and final releases of lien from all subcontractors, suppliers or other entities that have given a Notice to Owner; (ii) a Final or Temporary Certificate of Occupancy; and (iii) proof that all permits have been closed.

5. Commencement Date; Substantial Completion. Anything contained in Section 9 of the Contract to the contrary notwithstanding, Contractor shall commence the Work no later than fifteen (15) days following the date of issuance of all building permits and the Work shall be substantially completed within 52 weeks thereafter, except that the substantial completion date may be extended by the number of days that the Work is delayed due to force majeure or other events beyond the reasonable control of Contractor, which delays shall have been documented by written notice to Owner during the progress of the Work. For purposes of this Agreement, the term "substantial completion" shall mean the date when the Project is substantially complete in accordance with the Contract Documents and the Contractor obtains a certificate of occupancy for the Project from the applicable governmental authority.

CB

6. Occupancy. Section 12 of the Contract is hereby deleted.

7. Financing. Section 8 of the Contract is hereby deleted.

8. Contractor Financing. Contractor is to provide financing for Contract's Work. Contractor's financing must be a minimum of 80% of Total Contract Price including a reasonable draw schedule. In the event Contractor is unable to obtain the required financing Contractor shall have the option to terminate this Contract by written notice and return all monies paid to Contractor by Owner. Owner shall be entitled to a full refund of the Deposit without setoff or deduction of any kind.

9. Contractor Financing Costs. Owner is responsible for all costs associated with the Contractor's Work financing. Costs associated with the financing are, but not limited to the following: a. Owner shall have sole responsibility to pay loan origination points of two and a quarter percent (2.25%) of the loan amount.
b. Owner shall have sole responsibility for closing costs.
c. Owner shall have sole responsibility for loan fees.
d. Owner shall have sole responsibility for 6 months of prepaid interest on the loan amount as well as interest payments from month 7 through completion. Interest rate is 9 nine and a half percent rate (9.5%).
e. Owner shall have sole responsibility for loan extension cost of one percent of loan amount if necessary to extend loan beyond 12 months.

10. Property Deed. Owner is responsible for deeding the Property to Contractor within 30 days of the Contract date. Owner is to use a Quit Claim Deed legally executed with all information necessary to record in the public records of the Property's County.

11. Closing. At Property's Substantial Completion the final transaction between Contractor and Owner is the Closing where Owner remits payment according to the Contract, title to the Property passes to the Owner and the Contract is deemed to be complete. ("Closing")

Owner acknowledges and agrees that Contractor has the right in its sole discretion to schedule the date, time and place of the Closing. (the "Closing Date") Contractor is authorized to postpone or advance the date of Closing at its discretion. Contractor must, however, give Owner reasonable notice of the new Closing Date. Any notice of Closing may be given verbally, by telephone, mail, or e-mail. If Owner fails, for any reason, to close at the date, time and place specified by Contractor, Contractor shall have the option to declare Owner in default. Contractor shall convey title to Owner at Closing by delivery to Owner of a Quit Claim Deed. Owner is responsible to pay all costs, prorations and fees payable at Closing.

12. Counterparts. This Agreement may be executed in one or more counterparts and shall become effective only when one or more counterparts have been signed by all the parties. Each counterpart shall be deemed an original, but all of the counterparts together shall constitute only one single agreement.

13. Assignability. This Agreement may not be assigned by either Party, without the other Party's written consent, as long as the assignment is assigned to a legal entity, and as long as the assignment takes place no later than December 30, 2021.

CB

OWNER(S):

Claudio Bevilacqua

Dec 18, 2021

BEVILACQUA CLAUDIO ALEJANDRO | Date

Date

FRONTLINE CONSTRUCTION PARTNERS, LLC.

Dec 20, 2021

Seller/Contractor License #CRC58398 | Date

Alicia Jenks

Dec 20, 2021

Alicia Jenks | Date

A45 BEVILACQUA CLAUDIO ALEJANDRO
1RS007
CRC058398

Owner

Owner

CB

# JOB #1RS007 - CONTRACT

Final Audit Report 2021-12-20

| | |
|---|---|
| Created: | 2021-11-18 |
| By: | Alicia Jenks (ajenks@frontlinecapitalpartners.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAOj8qpgvoc8lVkzSGd8qLafm7REXP7E5K |

## "JOB #1RS007 - CONTRACT" History

Document created by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
2021-11-18 - 6:23:21 PM GMT- IP address: 47.200.118.26

Document emailed to Claudio Bevilacqua (inmoibiza@hotmail.com) for signature
2021-11-18 - 6:30:54 PM GMT

Email viewed by Claudio Bevilacqua (inmoibiza@hotmail.com)
2021-11-18 - 8:38:52 PM GMT- IP address: 179.26.74.30

Email viewed by Claudio Bevilacqua (inmoibiza@hotmail.com)
2021-12-18 - 3:15:37 PM GMT- IP address: 152.156.213.206

Document e-signed by Claudio Bevilacqua (inmoibiza@hotmail.com)
Signature Date: 2021-12-18 - 3:19:54 PM GMT - Time Source: server- IP address: 152.156.213.206

Document emailed to Don Boggus (dboggus@frontlinecapitalpartners.com) for signature
2021-12-18 - 3:19:56 PM GMT

Email viewed by Don Boggus (dboggus@frontlinecapitalpartners.com)
2021-12-20 - 5:29:05 PM GMT- IP address: 174.248.56.113

Document e-signed by Don Boggus (dboggus@frontlinecapitalpartners.com)
Signature Date: 2021-12-20 - 5:31:08 PM GMT - Time Source: server- IP address: 174.248.56.113

Document emailed to Alicia Jenks (ajenks@frontlinecapitalpartners.com) for signature
2021-12-20 - 5:31:11 PM GMT

Email viewed by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
2021-12-20 - 6:02:56 PM GMT- IP address: 47.200.118.26

Document e-signed by Alicia Jenks (ajenks@frontlinecapitalpartners.com)
Signature Date: 2021-12-20 - 6:03:25 PM GMT - Time Source: server- IP address: 47.200.118.26

Adobe Sign

Agreement completed.

2021-12-20 - 6:03:25 PM GMT

Exhibit C

ROGER D. EATON, CHARLOTTE COUNTY CLERK OF CIRCUIT COURT OR BOOK: 5027, PGS: 1191 , PAGE: 1 OF 2
INSTR # 3134644 Doc Type: D, Recorded: 8/1/2022 at 1:05 PM
Rec. Fee: RECORDING $18.50 D DOCTAX PD $0.70 Cashier By: JOHNH

2

Prepared by: Gregg Glasser
1267 2nd Street
Sarasota, FL 34236

Parcel ID#: 412131179013

This space for recorder use only.

# FLORIDA QUIT CLAIM DEED

This QUIT CLAIM DEED, made this 4TH day of MAY, 20 22, by BEVILACQUA CLAUDIO ALEJANDRO

whose address is C/O AMERICAN PRIME LLC 6100 BLUE LAGOON DR STE 410,MIAMI, FL, 33126

hereinafter called the Grantor, to

FRONTLINE CONSTRUCTION PARTNERS, LLC,

whose address is 1267 2ND STREET SARASOTA, FL 34236

hereinafter called the Grantee:

(Whereever used herein the terms "Grantor" and "Grantee" include all parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

Witnesseth: That the Grantor, for and in consideration of the sum of $ 100 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, and quitclaims unto the Grantee, all that certain land situate in CHARLOTTE County, Florida, viz:

*(legal description of property)*

22 COXSWAINE CIRCLE, PLACIDA, FL. 33946
ROTONDA SANDS UN 1 BLK 23 LT 25 698/2037 POA1773/166 1773/168
TD2365/904TD3666/1181 3983/511 3996/1526 4043/379 4054/1851 4150/397 4233/207

To have and to hold the same, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee.

In witness whereof, the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Witness Signature as to First Grantor

FREDDY BERGER
Printed Name

Witness Signature as to First Grantor

GABRIELA GOLPE
Printed Name

Witness Signature as to First Grantor

Printed Name

Witness Signature as to First Grantor

Printed Name

Signature of Grantor

CLAUDIO ALEJANDRO BEVILACQUA
Printed Name of Grantor

C/O AMERICAN PRIME LLC
Post Office Address

6100 BLUE LAGOON DR
STE. 410
MIAMI, FL, 33126
Signature of Grantor

Printed Name of Grantor

Post Office Address

CITY - MONTEVIDEO
COUNTRY - URUGUAY

The foregoing instrument was acknowledged before me this 23 day of JUNE, 2022, by CLAUDIO ALEJANDRO BEVILACQUA, who is personally known to me or has produced AAA 545890, as identification and who did/did not take an oath.

Notary Public

ROBERTO SOUBERBIE
ESCRIBANO

# Exhibit D

ROGER D. EATON, CHARLOTTE COUNTY CLERK OF CIRCUIT COURT OR BOOK: 5027, PGS: 1193, PAGE: 1 OF 2
INSTR # 3134645 Doc Type: D, Recorded: 8/1/2022 at 1:05 PM
Rec. Fee: RECORDING $18.50 D DOCTAX PD $0.70 Cashier By: JOHNH

0

Prepared by: Gregg Glasser
1267 2nd Street
Sarasota, FL 34236

Parcel ID#: 412131179012

This space for recorder use only.

# FLORIDA QUIT CLAIM DEED

This QUIT CLAIM DEED, made this 4TH day of MAY, 20 22, by BEVILACQUA CLAUDIO ALEJANDRO
whose address is C/O AMERICAN PRIME LLC 6100 BLUE LAGOON DR STE 410,MIAMI, FL, 33126
hereinafter called the Grantor, to
FRONTLINE CONSTRUCTION PARTNERS, LLC
whose address is 1267 2ND STREET SARASOTA, FL 34236
hereinafter called the Grantee:

(Whereever used herein the terms "Grantor" and "Grantee" include all parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

Witnesseth: That the Grantor, for and in consideration of the sum of $ 100 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, and quitclaims unto the Grantee, all that certain land situate in CHARLOTTE County, Florida, viz:

*(legal description of property)*

24 COXSWAINE CIR or 27 MAST DR, PLACIDA, FL. 33946
ROTONDA SANDS UN 1 BLK 23 LT 24 1115/50 DC1194/1563-EVS
DC3321/668-LASLOA3321/674 3321/678 3321/679 4195/1305 4233/207

To have and to hold the same, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee.

In witness whereof, the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Witness Signature as to First Grantor

FREDDY BERGER
Printed Name

Witness Signature as to First Grantor

GABRIELA GOLPE
Printed Name

Witness Signature as to First Grantor

Printed Name

Witness Signature as to First Grantor

Printed Name

Signature of Grantor

CLAUDIO ALEJANDRO BEVILACQUA
Printed Name of Grantor

C/O AMERICAN PRIME LLC
Post Office Address

6100 BLUE LAGOON DR.
STE. 410
MIAMI, FL, 33126
Signature of Grantor

Printed Name of Grantor

Post Office Address

CITY OF MONTEVIDEO
COUNTRY - URUGUAY

The foregoing instrument was acknowledged before me this 23 day of JUNE, 2022, by CLAUDIO ALEJANDRO BEVILACQUA, who is personally known to me or has produced AAA 545890, as identification and who did/did not take an oath.

Notary Public

[illegible] SOUBERBIELLE
[illegible]

# Exhibit E

ROGER D. EATON, CHARLOTTE COUNTY CLERK OF CIRCUIT COURT OR BOOK: 5031, PGS: 2026 , PAGE: 1 OF 2
INSTR # 3137945 Doc Type: D, Recorded: 8/9/2022 at 2:42 PM
Rec. Fee: RECORDING $18.50 D DOCTAX PD $0.70 Cashier By: JACKIEN

Prepared by: Gregg Glasser
1267 2nd Street
Sarasota, FL 34236

Parcel ID#: 412131179012

This space for recorder use only.

# FLORIDA QUIT CLAIM DEED

This QUIT CLAIM DEED, made this 22ND day of JULY, 20 22, by FRONTLINE CONSTRUCTION PARTNERS, LLC
whose address is 1267 2ND STREET SARASOTA, FL 34236
hereinafter called the Grantor, to
MODERN BUILDERS INC,
whose address is 1267 2ND STREET SARASOTA, FL 34236
hereinafter called the Grantee:

(Whereever used herein the terms "Grantor" and "Grantee" include all parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

Witnesseth: That the Grantor, for and in consideration of the sum of $ 100 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, and quitclaims unto the Grantee, all that certain land situate in CHARLOTTE County, Florida, viz:

*(legal description of property)*

24 COXSWAINE CIR or 27 MAST DR, PLACIDA, FL. 33946
ROTONDA SANDS UN 1 BLK 23 LT 24 1115/50 DC1194/1563-EVS
DC3321/668-LASLOA3321/674 3321/678 3321/679 4195/1305 4233/207

To have and to hold the same, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee.

In witness whereof, the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Alicia Jenks
Witness Signature as to First Grantor

ALICIA JENKS
Printed Name

Karl Karins
Witness Signature as to First Grantor

KARL KARINS
Printed Name

N/A
Witness Signature as to First Grantor

N/A
Printed Name

N/A
Witness Signature as to First Grantor

N/A
Printed Name

Signature of Grantor

GREGG GLASSER
Printed Name of Grantor

1267 2nd St Sarasota Florida 34236
Post Office Address

N/A
Signature of Grantor

N/A
Printed Name of Grantor

N/A
Post Office Address

STATE OF FLORIDA
COUNTY OF Charlotte

The foregoing instrument was acknowledged before me this 3rd day of August, 20 22, by GREGG GLASSER, who is personally known to me or has produced Drivers License, as identification and who did/did not take an oath.

Notary Public

NOTARY PUBLIC ★ STATE OF FLORIDA ★
Hannah Ogert
Notary Public, State of Florida
Comm. Expires 05-17-2025
Notary ID 1661873

Notarized Online with NotaryLive.com

# Exhibit F

ROGER D. EATON, CHARLOTTE COUNTY CLERK OF CIRCUIT COURT OR BOOK: 5031, PGS: 2028, PAGE: 1 OF 2
INSTR # 3137946 Doc Type: D, Recorded: 8/9/2022 at 2:42 PM
Rec. Fee: RECORDING $18.50 D DOCTAX PD $0.70 Cashier By: JACKIEN

Prepared by: Gregg Glasser
1267 2nd Street
Sarasota, FL 34236

Parcel ID#: 412131179013

This space for recorder use only.

# FLORIDA QUIT CLAIM DEED

This QUIT CLAIM DEED, made this 22ND day of JULY, 20 22, by
FRONTLINE CONSTRUCTION PARTNERS, LLC
whose address is 1267 2ND STREET SARASOTA, FL 34236
hereinafter called the Grantor, to
MODERN BUILDERS INC
whose address is 1267 2ND STREET SARASOTA, FL 34236
hereinafter called the Grantee:

(Whereever used herein the terms "Grantor" and "Grantee" include all parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

Witnesseth: That the Grantor, for and in consideration of the sum of $ 100 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, and quitclaims unto the Grantee, all that certain land situate in CHARLOTTE County, Florida, viz:

*(legal description of property)*

22 COXSWAINE CIRCLE, PLACIDA, FL. 33946
ROTONDA SANDS UN 1 BLK 23 LT 25 698/2037 POA1773/166 1773/168
TD2365/904TD3666/1181 3983/511 3996/1526 4043/379 4054/1851 4150/397 4233/207

To have and to hold the same, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee.

In witness whereof, the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Alicia Jenks
Witness Signature as to First Grantor

ALICIA JENKS
Printed Name

Karl Karins
Witness Signature as to First Grantor

KARL KARINS
Printed Name

N/A
Witness Signature as to First Grantor

N/A
Printed Name

N/A
Witness Signature as to First Grantor

N/A
Printed Name

[signature]
Signature of Grantor

GREGG GLASSER
Printed Name of Grantor

1267 2nd St Sarasota Florida 34236
Post Office Address

N/A
Signature of Grantor

N/A
Printed Name of Grantor

N/A
Post Office Address

STATE OF FLORIDA
COUNTY OF Charlotte

The foregoing instrument was acknowledged before me this 3rd day of August, 20 22, by GREGG GLASSER, who is personally known to me or has produced Drivers License, as identification and who did/did not take an oath.

NOTARY PUBLIC ★ STATE OF FLORIDA ★

Hannah Ogert
Notary Public, State of Florida
Comm. Expires 05-17-2025
Notary ID 1661873

Notarized Online with NotaryLive.com

[signature]
Notary Public

Filing # 206906327 E-Filed 09/16/2024 10:41:15 AM

IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR CHARLOTTE COUNTY, FLORIDA

CIVIL ACTION

Plaintiff(s),

vs.

CASE NO:

Defendant(s).

_______________________________/

**STANDING ORDER IN CIRCUIT CIVIL CASES IN THE TWENTIETH JUDICIAL CIRCUIT**

PURSUANT to Florida Rule of Civil Procedure 1.200(a), Florida Rule of Judicial Administration 2.545, and Administrative Order 1.13 (as amended) entered by the Chief Judge of this Circuit, the parties are ordered to adhere to the following information and procedures applicable to civil lawsuits:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service. The Plaintiff shall pay the appropriate statutory clerk's fees for copies for each Standing Order issued and attached to the Summons.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases (other than residential foreclosures, involuntary commitment of sexually violent predators , Extraordinary Writs, 90 day Notice of Medical Malpractice Claim, and Administrative Appeals), the parties are required to participate in the case management system. The Court will issue a Case Management Plan after 150 days of the filing of a case in the event the parties have not submitted an Agreed Case Management Plan that has been approved by the Court. However, if it becomes necessary to amend the court-issued Case Management Plan, the parties may submit an Agreed Case Management Plan, subject to approval by the Court, or if the parties cannot agree on an Amended Plan, the parties may request a case management conference. The form of the Agreed Case Management Plan may be accessed at the Court's website at: http://www.ca.cjis20.org/web/main/civil.asp. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

3. **ALTERNATIVE DISPUTE RESOLUTION (ADR).** ADR provides parties with an out-of-court alternative for settling disagreements. The Court requires the parties to participate in ADR prior to trial. Mediation is mandatory unless the parties agree to another form of ADR. Mediation is a conference at which an independent third party attempts to arrange a settlement between the parties. The Court, at its discretion, may order the case be referred to Non-Binding Arbitration. Non-Binding Arbitration is the process in which the court refers a case to a registered arbitrator, or panel of arbitrators, who will hear evidence and make an award which may become a final judgment if a Motion for Trial De Novo is not timely filed pursuant to Fla. R. Civ. P. 1820(h).

4. **FAILURE TO PROSECUTE.** The Court will issue a Notice of Intent to Dismiss a case if there is no record of activity within a ten (10) month period of time.

5. **RULES OF PROFESSIONALISM.** The Twentieth Judicial Circuit has adopted Administrative Order 2.20, which sets forth standards of professional courtesy and conduct for all counsel practicing within the Circuit and self-represented litigants. The Court requires that all parties familiarize themselves and comply with Administrative Order 2.20. Administrative Order 2.20 may be viewed on the Court's website at: http://www.ca.cjis20.org/web/main/ao_admin.asp

**DONE AND ORDERED** in Punta Gorda, Charlotte County, Florida, on April 30, 2021.

HONORABLE GEOFFREY GENTILE
CIRCUIT JUDGE